**Case No.: 24-60272**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

NicQuid, L.L.C.; Wood Creek Vapory,

*Petitioners,*

v.

Food & Drug Administration; Robert M. Califf, Commissioner of Food & Drugs; Xavier Becerra, Secretary, U.S. Department of Health and Human Services,

*Respondents.*

---

On Review Of FDA Marketing Denial Order (STN PM0003712)
Issued Under The Federal Tobacco Control Act

---

## PETITIONERS' FINAL BRIEF

Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, N.W.
Suite 500 West
Washington, D.C. 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioners*

No. 24-60272, *NicQuid, LLC, et al. v. U.S. Food and Drug Administration, et al.*

## CERTIFICATE OF INTERESTED PERSONS

## No. 24-60272; NicQuid, LLC, et al. v. FDA, et al.

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

1. NicQuid, LLC (Petitioner)

2. Scott Eley (NicQuid owner)

3. Robert Winslow (NicQuid owner)

4. Jack Manning (NicQuid owner)

5. Adam Knudsen (NicQuid owner)

6. Wood Creek Vapory (Petitioner)

7. Rataani Business Inc. (Wood Creek Vapory Owner)

8. Sanober Rataani (Wood Creek Vapory Owner)

9. Eric P. Gotting (counsel for Petitioners)

10. Azim Chowdhury (counsel for Petitioners)

11. U.S. Food and Drug Administration (Respondent)

12. U.S. Department of Health and Human Services (Respondent)

13. Hon. Merrick B. Garland (U.S. Attorney General)

14. Xavier Becerra (Respondent; HHS Secretary)

No. 24-60272, *NicQuid, LLC, et al. v. U.S. Food and Drug Administration, et al.*

15. Samuel R. Bagenstos (HHS General Counsel)

16. Robert M. Califf (Respondent; FDA Commissioner)

17. Brian King (Director, FDA Center for Tobacco Products)

18. Mark Raza (FDA Chief Counsel)

19. Wendy S. Vicente (FDA Deputy Chief Counsel for Litigation)

20. Lindsey E. Powell (counsel for Respondents)

21. Catherine M. Padhi (counsel for Respondents)

Petitioner NicQuid, LLC does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

Petitioner Wood Creek Vapory does not have any parent corporation or any publicly held corporation that owns 10% or more of its stock.

/s Eric P. Gotting
*Counsel for Petitioners*

C-2 of C-2

## STATEMENT REGARDING ORAL ARGUMENT

Petitioners request oral argument in this matter. This appeal raises important legal questions under the federal Family Smoking Prevention and Tobacco Control Act ("TCA") and Administrative Procedure Act ("APA"), and in particular Respondent U.S. Food and Drug Administration's ("FDA") denial of marketing authority for Petitioners' Electronic Nicotine Delivery System ("ENDS") products. This matter also involves an administrative record containing extensive scientific and technical data submitted to FDA by Petitioner NicQuid, LLC ("NicQuid") in support of its request for marketing authorization through Premarket Tobacco Product Applications ("PMTA"). Therefore, Petitioners believe oral argument will assist the Court in understanding and resolving the issues raised on appeal.

Petitioners note, however, that this Court has repeatedly found that FDA violated the TCA and APA when denying marketing authorization for ENDS products based on the same grounds invoked by FDA in Petitioners' case, including this Court's *en banc* decision in *Wages and White Lion Invs., LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024) ("*Wages*"); *see also R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (5th Cir. 2023) (entering stay). This Court also recently entered stays pending judicial review in this case and similar matters based on the controlling precedent in *Wages*. *See, e.g., NicQuid, LLC v. FDA*, No. 24-

60272 (Aug. 8, 2024) (ECF 60-1); *Vertigo Vapor, Inc. v. FDA*, No. 24-60332 (Aug. 16, 2024) (ECF 45-1). In fact, this Court, without holding oral argument, recently vacated similar marketing denial orders in five consolidated cases based on *Wages*. *SWT Global Supply, Inc. v. FDA*, No. 21-60762, 2024 WL 3595387 (5th Cir. July 31, 2024) (*see* ECF 166 canceling oral argument).

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................i

TABLE OF AUTHORITIES ...............................................................................iii

STATEMENT OF JURISDICTION........................................................................1

STATEMENT OF ISSUES......................................................................................2

STATEMENT OF THE CASE ...............................................................................4

    I.       Nature of the Case ..............................................................4

    II.     The Tobacco Control Act And FDA's Deeming Rule.................5

    III.    PMTA Deadlines And FDA Enforcement Discretion..................6

    IV.   The TCA's APPH Standard Requires FDA To Review And Weigh All Evidence Contained In A PMTA And In FDA's Possession ........................................................................7

    V.    FDA Must Consider Evidence Showing That A Manufacturer's Underage Marketing and Access Restrictions Are Working...........................................................11

    VI.   FDA Instructed Manufacturers That Long-Term Studies Were Not Required And Left Product Comparisons To Their Discretion.......................................................................12

    VII.  FDA Consistently Treated Open-System ENDS Products And Menthol-Flavored Products Differently Than Other Products ........................................................................14

    VIII. FDA Represented That It Would Issue At Least One Deficiency Letter To An Applicant Before Issuing A Marketing Decision .............................................................16

    IX.   NicQuid And Wood Creek Vapory...........................................16

    X.    NicQuid's PMTA ...................................................................17

    XI.   FDA's Marketing Denial Order ("MDO") And Technical Project Lead ("TPL") Review .................................................22

STANDARD OF REVIEW ...................................................................... 24

SUMMARY OF ARGUMENT ................................................................ 25

ARGUMENT ......................................................................................... 30

    I.     FDA Failed To Give NicQuid Fair Notice Of The Comparative Efficacy Study Requirement And Otherwise Acted In An Arbitrary And Capricious Manner By Issuing The MDO ....................................................................... 30

    II.    The MDO Violates The TCA And Is Ultra Vires....................... 34

    III.   FDA Failed To Weigh Evidence Highly Relevant To An APPH Finding And Thus The MDO Is Arbitrary and Capricious ................................................................... 37

    IV.   FDA Instituted A De Facto Restriction Or Ban On Non-Tobacco Flavored ENDS, Including Menthol-Flavored Products, In Violation Of Notice-And-Comment Procedures ..... 42

    V.    FDA Unlawfully Applied The MDO To Zero-Nicotine Products And A Tobacco-Flavored Product ............................ 45

CONCLUSION....................................................................................... 47

CERTIFICATE OF COMPLIANCE ..................................................... 48

CERTIFICATE OF SERVICE .............................................................. 49

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*BNSF Railway Co. v. FRA,*
  62 F.4th 905 (5th Cir. 2023) ........................................................ 37

*Chamber of Commerce of the U.S. v. SEC,*
  85 F.4th 760 (5th Cir. 2023) ........................................................ 33

*City of Arlington, Tex. v. FCC,*
  569 U.S. 290 (2013) ..................................................................... 34

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ..................................................................... 31

*Genuine Parts Co. v. EPA,*
  890 F.3d 304 (D.C. Cir. 2018) ..................................................... 37

*Judulang v. Holder,*
  556 U.S. 42 (2011) ....................................................................... 41

*League of United Latin Am. Citizens v. Regan,*
  996 F.3d 673 (9th Cir. 2021) ....................................................... 36

*Loper Bright Enterprises v. Raimondo,*
  144 S. Ct. 2244 (2024) ................................................................. 34

*Michigan v. EPA,*
  576 U.S. 743 (2015) ................................................................ 35, 41

*R.J. Reynolds Vapor Co. v. FDA,*
  65 F.4th 182 (2023) .................................... 25, 29, 30, 32, 33, 41, 42, 43, 44

*SWT Global Supply, Inc. v. FDA,*
  No. 21-60762, 2024 WL 3595387 (5th Cir. July 31, 2024) .......... 26

*Texas v. U.S.,*
  809 F.3d 134 (5th Cir. 2015) ....................................................... 44

iii

*U.S. v. Avants,*
   367 F.3d 433 (5th Cir. 2004) ......................................................... 33

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS,*
   985 F.3d 472 (5th Cir. 2021) ......................................................... 37

*Wages and White Lion Invs., LLC v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ....................................................... 25

*Wages and White Lion Invs., LLC v. FDA,*
   90 F.4th 357 (5th Cir. 2024) ... 2, 5, 9, 25, 26, 27, 29, 31, 32, 33, 38, 39, 42, 43

*Wages and White Lion Invs., LLC v. FDA,*
   2024 WL 3259693 (No. 23-1038) .................................................. 33

## Statutes

5 U.S.C. §553 .................................................................................... 44
5 U.S.C. §706(2) ............................................................................... 44
5 U.S.C. §706(2)(A) .......................................................................... 24
5 U.S.C. §§706(2)(A), (2)(C), (2)(D) ................................................ 34
5 U.S.C. §§706(2)(B)-(D) .................................................................. 25
21 U.S.C. §321(rr) ............................................................................. 45
21 U.S.C. §387 ..................................................................................... 5
21 U.S.C. §387a(a) .............................................................................. 6
21 U.S.C. §387f(d) ............................................................................ 11
21 U.S.C. §§387g(a)(1)-(4) ............................................................... 42
21 U.S.C. §387g(a)(4) ....................................................................... 35
21 U.S.C. §§387g(c)-(d) .................................................................... 42
21 U.S.C. §387j .............................................................................. 1, 6
21 U.S.C. §387j(b)(1) ........................................................................ 34
21 U.S.C. §387j(c)(1)(B) ................................................................... 11
21 U.S.C. §387j(c)(2) ..................................................................... 7, 34
21 U.S.C. §387j(c)(4) ................................................................. 6, 7, 23
21 U.S.C. §387j(f) ............................................................................. 33
21 U.S.C. §387*l* ................................................................................. 1
21 U.S.C. §387*l*(a) ............................................................................. 1

## Regulations

21 C.F.R. §1114.7 ............................................................................. 10

iv

81 Fed. Reg. 28974 (May 10, 2016)...............................................................6
84 Fed. Reg. 50566 (Sept. 25, 2019) .................................................. 11, 13, 14
86 Fed. Reg. 55300 (Oct. 5, 2021)......................................................7, 8, 10
87 Fed. Reg. 26454 (May 4, 2022) ........................................................... 42

## STATEMENT OF JURISDICTION

This Court has jurisdiction under Section 912, 21 U.S.C. §387*l*(a), of the Family Smoking Prevention and Tobacco Control Act ("TCA") to review the U.S. Food and Drug Administration's ("FDA") marketing denial order ("MDO") issued to Petitioner NicQuid, LLC ("NicQuid") on May 3, 2024. The MDO denied marketing authorization sought by NicQuid in a Premarket Tobacco Product Application ("PMTA") filed under Section 910, 21 U.S.C. §387j, of the TCA for various Electronic Nicotine Delivery System ("ENDS") products (open system non-tobacco flavored and tobacco-flavored ENDS). The MDO fully and finally decided NicQuid's PMTA at the administrative level. 21 U.S.C. §§387j, 387*l*.  NicQuid filed a timely Petition for Review with this Court on June 1, 2024 pursuant to the 30-day deadline set forth in 21 U.S.C. §387*l*(a).  Venue is proper in this circuit as Petitioner Wood Creek Vapory is located in Schertz, Texas.  *See also* Unpublished Order issued on July 30, 2024 (ECF 53-1) denying motion to dismiss based on venue.

**STATEMENT OF ISSUES**

Petitioner NicQuid, LLC ("NicQuid") filed an extensive Premarket Tobacco Product Application ("PMTA") with Respondent U.S. Food and Drug Administration ("FDA") pursuant to the Family Smoking Prevention and Tobacco Control Act ("TCA") seeking FDA's authorization to market and sell various tobacco-flavored and non-tobacco flavored (*e.g.*, menthol) Electronic Nicotine Delivery System ("ENDS") products (*i.e.*, electronic cigarettes). FDA denied the PMTA because it did not contain a specific type of study – a randomized controlled trial ("RCT"), a longitudinal cohort study, or an unspecified similar study (*i.e.*, a "comparative efficacy study") – showing that NicQuid's non-tobacco-flavored ENDS are more effective than NicQuid's tobacco-flavored ENDS in helping adult smokers switch away from traditional cigarettes. FDA also failed to weigh extensive evidence in NicQuid's PMTA, as well as FDA's own data, showing that NicQuid's ENDS meet the TCA's statutory "appropriate for the protection of the public health" ("APPH") standard. This case raises the following issues:

1.    Did FDA act contrary to this Court's *en banc* decision in *Wages and White Lion Invs., LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024) ("*Wages*"), violate the Administrative Procedure Act ("APA") and the Due Process Clause of the Fifth Amendment, and otherwise proceed in an arbitrary, capricious, and

2

unlawful manner when it failed to give Petitioners fair notice of its comparative efficacy approach, explain changes in its regulatory approach to certain ENDS and marketing/access plans, or consider Petitioners' legitimate reliance interests when denying NicQuid's PMTAs?

2.    Did FDA violate the TCA and act *ultra vires* when it denied NicQuid's PMTAs based on the comparative efficacy approach rather than conducting a full scientific review of NicQuid's PMTA to determine whether the ENDS products satisfy the APPH standard?

3.    Did FDA violate the APA and proceed in an arbitrary and capricious manner when it denied NicQuid's PMTA based on the absence of a comparative efficacy study instead of weighing extensive information and data demonstrating that NicQuid's ENDS are APPH?

4.    Did FDA violate the TCA and otherwise institute a *de facto* restriction or ban on non-tobacco flavored ENDS, including menthol products, in violation of the TCA's and APA's notice and comment procedures?

5.    Did FDA violate the TCA and APA when it applied the MDO and the comparative efficacy study requirement to NicQuid's zero-nicotine products and a tobacco-flavored product?

## STATEMENT OF THE CASE

### I.    Nature of the Case

This case challenges Respondent U.S. Food and Drug Administration's ("FDA") denial of marketing authorization for Petitioner NicQuid, LLC's ("NicQuid") tobacco-flavored and non-tobacco flavored Electronic Nicotine Delivery System ("ENDS") products, manufactured and/or sold by NicQuid and Petitioner Wood Creek Vapory ("Wood Creek Vapory"), as unlawful under the Family Smoking Prevention and Tobacco Control Act ("TCA"), the Administrative Procedure Act ("APA"), and the Due Process Clause of the Fifth Amendment.  As required by the TCA, NicQuid submitted to FDA an extensive Premarket Tobacco Product Application ("PMTA") containing information and data demonstrating that its ENDS products meet the TCA's "appropriate for the protection of the public health" ("APPH") standard.[1]

---

[1] NicQuid only manufactures bottled e-liquids, which are sold for use in "open-system" ENDS.  NicQuid does not manufacture or sell closed-system ENDS, such as disposables.  Open-system ENDS devices do not come pre-filled with e-liquid; rather, the consumer must purchase bottled e-liquids and fill the device's open tank manually.  In contrast, closed-system ENDS are pre-filled with e-liquid and are not re-fillable.  They either involve the user inserting a pod or cartridge containing e-liquid into the device (which is then replaced when the e-liquid contents are entirely consumed) or a disposable device that comes pre-filled with e-liquid (with the entire device being disposed of after the e-liquid runs out).  NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A086).

On May 3, 2024, FDA issued NicQuid a marketing denial order ("MDO") prohibiting the continued marketing and sale of NicQuid's ENDS products in the United States. FDA did so without substantively reviewing significant portions of NicQuid's PMTA or considering its own data that are directly contrary to the MDO; instead, FDA determined that the PMTA did not contain a single discrete study – *i.e.*, a randomized controlled trial ("RCT"), a longitudinal cohort study, or an unspecified similar study (*i.e.*, a "comparative efficacy study") – demonstrating that NicQuid's non-tobacco-flavored ENDS are more efficacious than NicQuid's tobacco-flavored ENDS in helping adult smokers switch away from combustible cigarettes. This is the same study requirement that this Court vacated in its *en banc* decision *Wages and White Lion Invs., LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024) ("*Wages*").[2]

## II.    The Tobacco Control Act And FDA's Deeming Rule

In 2009, Congress enacted the TCA, amending the Food, Drug and Cosmetic Act ("FDCA"), to give FDA regulatory authority over the marketing and sale of "tobacco products." 21 U.S.C. §387, *et seq.* Six years later, on August 8, 2016, FDA's "Deeming Rule" went into effect, which applied the

---

[2] On August 8, 2024, this Court entered a stay of the MDO pending judicial review (ECF 60-1) based on "controlling precedent in" *Wages*.

5

TCA to ENDS and other tobacco products that had not been initially regulated under the TCA. 21 U.S.C. §387a(a); 81 Fed. Reg. 28974 (May 10, 2016).

Consequently, ENDS were immediately subject to numerous TCA provisions, including a requirement that ENDS manufacturers, including NicQuid, obtain premarket authorization from FDA before continuing to market and sell their products. 21 U.S.C. §387j. A manufacturer must submit a PMTA which, as discussed below, entails a time-consuming and costly process of compiling extensive scientific, technical, and marketing data, all of which the TCA requires FDA to review when deciding whether a particular ENDS product meets the TCA's APPH standard. 21 U.S.C. §387j(c)(4).

### III.    PMTA Deadlines And FDA Enforcement Discretion

Because the sudden application of the TCA's requirements to ENDS would abruptly force thousands of existing products off the market, FDA established a series of deferred enforcement policies permitting existing ENDS to remain on the market until PMTAs were due. A federal district court ultimately set the PMTA deadline for September 9, 2020. *Am. Academy of Pediatrics, et al. v. FDA*, 8:18-cv-00883-PWG (D. Md.) (Dkt. Nos. 127 & 182). Any ENDS subject to a timely filed PMTA could remain on the market until September 9, 2021, after which the product would be subject to enforcement discretion. *Id.* NicQuid is not aware FDA has ever issued a warning letter or

6

initiated an enforcement action against an ENDS manufacturer for a product subject to a timely filed PMTA pending before FDA, nor has it received an enforcement action by any governmental agency. *See* NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A086, A092).

### IV. The TCA's APPH Standard Requires FDA To Review And Weigh All Evidence Contained In A PMTA And In FDA's Possession

The TCA requires FDA to conduct a complex, science-based evaluation based on all contents in a PMTA and relevant evidence in FDA's possession to determine whether a product is APPH. *See, e.g.*, 21 U.S.C. §387j(c)(2) (review based on "information submitted to [FDA] as part of the application and any other information before [FDA] with respect to such tobacco product"). The TCA directs FDA to make that determination "with respect to the risks and benefits to the population *as a whole*, including users and nonusers of the tobacco product, and taking into account – (A) the increased or decreased likelihood that existing users of tobacco products will stop using such products; and (B) the increased or decreased likelihood that those who do not use tobacco products will start using such products." 21 U.S.C. §387j(c)(4) (emphasis added). Accordingly, FDA has repeatedly described APPH as an all-encompassing, multi-factored, multi-disciplinary standard.

For instance, FDA noted in a final rule implementing the PMTA requirements that APPH involves a "complex determination," 86 Fed. Reg.

7

55300, 55335 (Oct. 5, 2021), that FDA "considers many factors," *id.* at 55314, and that FDA does not make a "determination on one static set of requirements," *id.* at 55385. FDA further declined "to assign weight to different types of evidence," *id.* at 55335, emphasizing APPH "requires a balancing" of risks and benefits. *Id.* at 55384. FDA also refused "to create a series of criteria" that all products must meet for APPH, stated that an APPH "determination would involve consideration of many factors," and noted it "will be made with respect to…the population as a whole, rather than whether a product meets each item in a series of specific criteria." *Id.* at 55386. Significantly, FDA committed to determining APPH on an "individualized" basis, the "risks and benefits of a specific tobacco product" and "based on *all* of the contents of the application." *Id.* at 55320, 55390 (emphasis added).

During the rulemaking, FDA also rejected a comment demanding that an APPH evaluation focus on population segments most likely to be affected by ENDS and "require applications to show a public health benefit for those specific groups." FDA concluded FDA does not require applicants to show a public health benefit for specific population segments. *Id* at 55385. Further, in response to comments asking FDA to impose specific requirements on flavored tobacco products before issuing a marketing order, FDA again

8

"declin[ed] to create a series of criteria that either all products or a specific subset of products must meet…to be considered APPH." *Id.* at 55386.

Similarly, in June 2019, FDA issued final PMTA guidance "intended to assist persons submitting" PMTAs which also discussed APPH. Appx00368.[3] Specifically, FDA said it "weighs all of the potential benefits and risks from information contained in the PMTA" to make an APPH determination. Appx00371.[4] During October 2018[5] and October 2019[6] public meetings, FDA described a PMTA review as constituting a "multi-disciplinary" approach.

The PMTA guidance, which runs over 50 pages, also identifies numerous types of information and data that are considered by FDA as being supportive of an APPH finding. These include, *inter alia*, sales restrictions guarding against underage use, label warnings, health risk studies, toxicological and pharmacological testing, public literature reviews,

---

[3] FDA's Administrative Record Index (ECF 47) only references the updated March 2023 version of the PMTA guidance document. We cite herein to the 2019 version as that was in effect when NicQuid filed its PMTA. *See, e.g.,* *Wages,* 90 F.4th at 364-65 (repeatedly referring to the 2019 version).

[4] *See* 2023 updated PMTA Guidance (same). Appx00096.

[5] FDA, Tobacco Product Application Review Public Meeting, at 119 (Oct. 22, 2018), https://tinyurl.com/44a7mnbx. *See, e.g., Wages,* 90 F.4th at 364 (repeatedly citing to the 2018 public meeting).

[6] FDA, Deemed Tobacco Product Applications: A Public Meeting, at 19 (Oct. 28-29, 2019), https://tinyurl.com/y7kju8yp. *See, e.g., Wages,* 90 F.4th at 365-66 (repeatedly referring to the 2019 public meeting).

pharmacokinetic evaluations, and consumer/customer perception and intention studies. Appx00371; Appx00374-00381. *See* 86 Fed. Reg. at 55414-32 (21 C.F.R. §1114.7 listing of extensive information and data required for PMTAs).[7]

For the court's convenience, presented below is a 2019 FDA diagram depicting some of the many APPH factors that FDA considers as part of a complete APPH analysis.[8]



---

[7] *See also* 2023 updated PMTA guidance. Appx00124 (requesting consumer perception and intention studies).

[8] *See* https://tinyurl.com/98jc36hc.

### V. FDA Must Consider Evidence Showing That A Manufacturer's Underage Marketing and Access Restrictions Are Working

Under the TCA, FDA is obligated to consider the positive impact underage restrictions on the marketing and sale of a product to minors could have on the APPH determination. 21 U.S.C. §387j(c)(1)(B) (providing a marketing granted order "may require that the sale and distribution of the tobacco product be restricted" and citing to 21 U.S.C. §387f(d) as permitting FDA to impose underage "access" and "advertising and promotion" restrictions to meet the APPH standard).

Before NicQuid filed its PMTA, FDA explicitly told manufacturers that marketing plans were key to obtaining an APPH finding. In a September 2019 proposed PMTA rule, FDA stated marketing plans would be "critical." 84 Fed. Reg. 50566, 50581 (Sept. 25, 2019). In the June 2019 PMTA guidance, FDA said it would weigh marketing and access restrictions that would decrease the likelihood of underage use. Appx00379-00380.

In fact, FDA recommended in a January 2020 enforcement policy (updated April 2020) "adequate measures" that manufacturers of open-system e-liquids, like NicQuid, could take to guard against underage use. Appx00238-00239. These measures included: (i) monitoring retailer compliance with age-verification and sales restrictions; (ii) establishing a manufacturer's right to terminate a retailer relationship if the retailer fails to comply with underage

11

restrictions; and (iii) requiring retailers to limit the quantity of ENDS a customer may purchase within a given period of time. *Id.*

Importantly, FDA requested in the 2019 guidance that, for products already in the marketplace, manufacturers submit sales data on their products broken down by population demographics, including age. FDA also requested the same type of information from national surveys. Appx00380. These comments mirrored an October 2018 public meeting where FDA stated "[i]nferences regarding youth may be extrapolated from young adults, as well as derived from marketing data…[and] national surveys." Appx00364. FDA asked for this information to better understand underage use patterns. Appx00380.

## VI. FDA Instructed Manufacturers That Long-Term Studies Were Not Required And Left Product Comparisons To Their Discretion

Before NicQuid filed its PMTA, FDA identified what forms of scientific evidence would (and would not) likely be required in a PMTA to demonstrate APPH. To begin, FDA said long-term studies (*e.g.*, clinical studies) would likely not be necessary. In the June 2019 guidance, FDA advised that it "does not expect that applicants will need to conduct long-term studies to support an application." Appx00372. FDA also identified the types of evidence that might adequately substitute for long-term studies. The guidance stated "[a]lthough randomized clinical trials could address cessation behavior of users

12

of tobacco products, FDA believes this would also be true for observational studies (perception, actual use, or both) examining cessation behaviors." Appx00379.

Further, in the 2019 proposed PMTA rule, FDA said it "recognizes that…long-term data is not available for all categories of products and does not expect that long-term clinical studies (*i.e.*, those lasting approximately 6 months or longer) will need to be conducted for each PMTA." 84 Fed. Reg. at 50619; *id.* at 50603 (requesting cross-sectional surveys like FDA's own National Youth Tobacco Survey or "NYTS").  Then, during an October 2019 public meeting, FDA said "[i]t may be possible to support a marketing order for a[n] ENDS product without conducting new, non-clinical or clinical studies given other data sources can support this PMTA."  Appx00362.  And during the October 2018 public meeting, FDA affirmatively stated no specific studies are absolutely required for a PMTA.  "[I]t may be possible to support a marketing order for an ENDS product…without conducting new non-clinical or clinical studies given other data sources can support the PMTA." Appx00365-00366.

The 2019 PMTA guidance also recommended that applicants include evidence comparing the relative "health risks" of their ENDS products to those of other tobacco products.  FDA suggested comparing products "within the

13

same category and subcategory, as well as products in different categories as appropriate." Significantly, FDA did not specify products that must be compared; instead, FDA left it to the applicant to decide what comparator products to use. Appx00372-00373. The 2019 proposed PMTA rule also gave manufacturers discretion on what products to compare. 84 Fed. Reg. at 50600. And during the October 2018 public meeting FDA recommended that applicants compare the new tobacco product to a representative sample of tobacco products on the market and include justification for why using evidence or data from other products is appropriate. Appx00367.

At no time prior to the PMTA filing deadline did FDA state that an ENDS manufacturer must conduct a specific type of clinical or long-term study – *i.e.*, a comparative efficacy study – identified in the MDO, let alone indicate that its absence would prevent an application from receiving a full substantive, scientific review and, instead, *automatically* result in a marketing denial.

## VII.  FDA Consistently Treated Open-System ENDS Products And Menthol-Flavored Products Differently Than Other Products

Before the PMTA deadline, FDA characterized open-system ENDS and menthol-flavored products as relatively low risk. In a January 2020 enforcement guidance, FDA stated it was focused on "flavored, cartridge-based ENDS products (other than tobacco- or menthol-flavored [ENDS] products)." FDA explained this "strikes an appropriate balance between

14

restricting youth access to [flavored, cartridge-based products], while maintaining availability of potentially less harmful options for current and former adult smokers who have transitioned or wish to transition completely away from combusted cigarettes." Appx00237. FDA said "[t]his policy should have minimal impact on small manufacturers (*e.g.*, vape shops) that primarily sell [open-system] ENDS products, unless they market to youth or fail to take adequate measures to prevent youth access." Appx00235.

The enforcement guidance also explained why open-systems do not present the same risk to youth as closed-systems. Minors are more attracted to closed-systems because of their "relatively small size that allows for easy concealability" (such as being small enough to hide in one's palm or pocket, or being shaped like an everyday flash drive) and "intuitive and convenient features that facilitate ease of use" (like draw activation, prefilled cartridges or pods, and USB rechargeability). Appx00233-00234. Open-system ENDS, and particularly bottled e-liquids used in these devices like NicQuid's products, do not share these characteristics.

Moreover, in September 2021, FDA publicly released a "Sample Decision Summary Document" – a template of what is called a Technical Project Lead ("TPL") Review which is issued in support of each MDO – stating that "[t]he term flavored ENDS in this review refers to any ENDS other

15

than tobacco-flavored and menthol-flavored ENDS…Applications for menthol-flavored ENDS will be addressed separately.  When it comes to evaluating the risks and benefits of a marketing authorization, the assessment for menthol ENDS, as compared to other non-tobacco-flavored ENDS, raises unique considerations." Appx00305.  As the enforcement guidance explained, "[m]enthol is unique" because "it is the only characterizing flavor available in cigarettes" and thus smokers may look to menthol ENDS to move "completely away from combusted products." Appx00240.

### VIII. FDA Represented That It Would Issue At Least One Deficiency Letter To An Applicant Before Issuing A Marketing Decision

FDA told manufacturers there would be some communication during the review process before it made a marketing decision.  During the October 2019 public meeting, FDA stated if it "has any questions or identifies additional information needed to render a decision, FDA may choose to issue a Deficiency Letter." Appx00361.  FDA then clarified at a June 2021 virtual meeting that it would issue at least one "deficiency letter" giving the applicant a chance to correct any shortcomings in the PMTA.  Appx00269.

### IX. NicQuid And Wood Creek Vapory

NicQuid was co-founded in 2009 among four friends.  They were all long-time smokers who were able to quit combustible cigarettes using ENDS. They launched NicQuid's bottled e-liquid manufacturing operations in 2012.

16

Their goal was simple: provide a non-combustible cigarette alternative for adult smokers who were unable or unwilling to quit tobacco or nicotine use altogether, while ensuring that its products did not get into the hands of minors.  Today, NicQuid has twelve full-time employees.  NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A084-85).

Similarly, Wood Creek Vapory was established in 2014 with the aim to provide adult smokers with a less harmful alternative to traditional cigarettes. The founders were long-time smokers and, after a relative passed due to complications from smoking cigarettes, they took a hard look at their own smoking habits and sought out a better way to consume nicotine without the negative and life-ending effects of combustible cigarettes.  Wood Creek Vapory is a long-standing NicQuid customer and sells products subject to the MDO. NicQuid Stay Mot., Wood Decl. (ECF 14-2) (A060-61).

## X.    NicQuid's PMTA

NicQuid filed its PMTA on September 8, 2020 covering, among other products, five menthol-flavored, one tobacco-flavored, and one strawberry peach flavored bottled e-liquid ENDS.  Appx000005-000006.  With the exception of "NicQuid Added Burst," available in only a in 0 mg/mL nicotine

concentration, the products at issue include 0, 3, 6, 12, 18, and 24 mg/mL nicotine levels in two bottle sizes for the other flavors.[9] *Id.*

The PMTA was an immense undertaking only possible due to the joint work of hardworking employees, regulatory consultants, scientific labs, and attorneys. The application demonstrates that NicQuid's products are APPH and will play an important role in contributing to a future where cigarette smoking is in the past. NicQuid spent nearly five years assembling the application, totaling 70,000 pages, and invested $1,000,000. NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A100-101).

Overall, the PMTA included, among other things, e-liquid testing for potentially harmful chemicals, toxicological analysis of ingredients, a comprehensive scientific literature review, stability studies, good manufacturing practices, marketing restrictions and youth-access prevention measures, and data regarding sales demographics. Appx00306-00316.

The product-specific data included in NicQuid's PMTA, along with the supporting comprehensive scientific literature review, clearly demonstrate that NicQuid's e-liquids present substantially lower health risks compared to other tobacco products, including combustible cigarettes and the FDA-authorized

---

[9] NicQuid Added Burst is not a finished e-liquid; rather, it is a menthol flavor additive. NicQuid Stay Mot., Eley Decl. (14-2) (A106).

IQOS heat-not-burn device. When compared to aerosol analysis of combustible cigarettes, as well authorized reduced-risk products such as IQOS, NicQuid open-system e-liquids demonstrate substantially lower potential exposures to numerous Harmful and Potentially Harmful Constituents ("HPHCs") and other constituents when used as intended, and levels on par with other ENDS on the market, based on publicly available information. Appx00317-00322.

The PMTA also included a March 2020 consumer use survey indicating NicQuid customers usem menthol/mint-flavored ENDS more than tobacco-flavored ENDS and use them to quit combustible cigarettes. The majority (78%) of the respondents used NicQuid ENDS. Almost all of them (94%) were current ENDS users and former smokers. Over 60% of the respondents said they used mint/menthol flavored ENDS, contrasting with only 19% stating they used tobacco-flavored ENDS. Over 40% of the respondents reported they are using ENDS to stay away from other tobacco products like traditional cigarettes. Appx00323-00327.

NicQuid is also vehemently opposed to all underage ENDS use and submitted an extensive plan detailing the company's underage marketing and access restrictions. Among the steps instituted by NicQuid include: (i) using mature product packaging that does not rely on imagery of food items or other

19

imagery that might appeal to youth (cartoons, mascots, childish images); (ii) focusing on marketing in specialty, adult-oriented vape shops (as opposed to mass sales channels like convenience stores); (iii) monitoring wholesale and retail partners to ensure they market the brand only to adults; (iv) not permitting the use of youthful-looking models or social media influencers; (v) using FDA-compliant nicotine warnings and labels that warn against underage use; (vi) not relying on print ads, magazines, radio, or billboards; (vii) age-gating social media accounts to adults 21 years of age or older; and (viii) limiting email advertising to age-verified purchasers. Appx00328-00343.

NicQuid also outlined in the PMTA substantial policies to prevent underage access to its products. These include: (i) requiring retailers to restrict online retail sales to consumers verified through age-verification software (*e.g.*, AgeChecker.net); and (ii) requiring wholesalers and retailers to sign an agreement that, among other things, obligates them to comply with all 21+ age restrictions, verify photo IDs of anyone who appears 27 years old or younger, post signage prohibiting underage use, employ age-verification software for online sales, comply with enhanced access provisions of California's Stop Tobacco Access to Kids Enforcement Act ("STAKE Act"), establish a hotline to anonymously report noncompliant sales, implement a policy of notifying FDA of retailer violations, develop an internal auditing program (like a

20

mystery shopper program), and restrict the quantity of ENDS products that may be purchased in a single transaction. Appx00344-00351.

NicQuid also explained why its zero-nicotine ENDS were included in the PMTA based on FDA guidance requiring manufacturers to include the lowest and highest concentrations when "bracketing" products in bundled PMTA submissions (like NicQuid's) and conducting product-specific testing. NicQuid's PMTA explicitly stated "HPHC data was generated using a bracketing approach in which only samples on the extremes of nicotine concentrations were tested. As FDA recognizes, this bracketing assumes that the results of any intermediate levels is represented by the results of the extremes tested. This is also consistent with FDA's recommendations for bridging data based on FDA's Final PMTA guidance." Appx00319.

Finally, sales data submitted with the PMTA demonstrated that these underage marketing and access restrictions are working. Based on NicQuid retail transactions between December 2018 and August 2020, the vast majority of transactions and orders (99%) were made by adults age 25 years or older. Almost 70% of those consumers skewed even older, being 45 years or older. In contrast, only 0.69% of those transactions and orders fell within the 18-24 years old range, with nobody under 20 purchasing a NicQuid product.

21

Appx00352 (the federal government did not raise the legal age to purchase

ENDS to 21 years of age until December 2019).

And these sales data are confirmed by more recent NYTS survey results,

collected annually by FDA and the Centers for Disease Control ("CDC"),

demonstrating that underage consumers are not using NicQuid open-system

ENDS.  No high school or middle school respondent in 2021, 2022, or 2023

reported having used a NicQuid product.[10]

### XI.   FDA's Marketing Denial Order ("MDO") And Technical Project Lead ("TPL") Review

FDA issued the MDO to NicQuid on May 3, 2024, well over three years

after NicQuid filed its PMTA.  Appx000001-000007.  FDA found NicQuid's

products are not APPH because the PMTA "lack[ed] sufficient evidence

demonstrating that your flavored ENDS will provide a benefit to adult users

that would be adequate to outweigh the risks to youth."  Appx000001.

Specifically, FDA rejected the PMTA because it did not contain a comparative

efficacy study – a single, highly-specific study designed to elicit one datapoint –

*i.e.*, a randomized controlled and/or longitudinal cohort study or other study

---

[10] *See* Centers for Disease Control, *About Historical NYTS Data and Documentation*, https://tinyurl.com/yztnwy86.

that compared the cessation benefits over time of NicQuid's non-tobacco flavored products and a comparator tobacco-flavored product. Appx000002.

FDA also claimed NicQuid's marketing and other underage restrictions would not sufficiently reduce risk to youth from non-tobacco flavored ENDS, and that unidentified "cross-sectional surveys" from NicQuid's public literature review did not provide sufficient comparative efficacy data because they did not involve NicQuid's products, did not measure cessation benefits "over time," and did not compare non-tobacco and tobacco-flavored ENDS. Appx00034-00035.

The TPL supporting the MDO made several key points. First, APPH requires that the product generate a "net benefit" to public health based on the "risks and benefits to the population as a whole." Appx00010; 21 U.S.C. §387j(c)(4). Significantly, the TPL notes that an APPH finding is not limited to just risks to youth and cessation benefits to adults; rather, it encompasses all other information regarding a product (*e.g.*, chemistry, toxicology, reductions in premature mortality, increases in life-years lived, etc.). Appx00012, -00015. Second, when weighing all of the PMTA's contents, FDA stated "[a]s the known risks of the product increase or decrease, the burden of demonstrating a substantial enough benefit likewise increases or decreases." Appx00011.

23

Despite these comments, FDA only conducted a "targeted review" of NicQuid's PMTA and determined a full scientific review was "unnecessary." Appx00012; *see* Appx00034. This was based solely on the absence of a comparative efficacy test, the fact that NicQuid's marketing and access restrictions did not include what FDA referred to as "novel" measures in the form of "device access restrictions," and the same criticisms lodged in the MDO regarding the unidentified "cross-sectional surveys." Appx00013-00014, -00033. Indeed, the TPL spends little time discussing NicQuid's products specifically and, instead, appears to consist largely of mere boilerplate.

FDA concluded that, despite having not reviewed the entire PMTA, NicQuid could not overcome these alleged shortcomings and show a net benefit, and thus for efficiency's sake, it would deny. Appx00018. In fact, wholly unrelated to the APPH standard, FDA complained that conducting a "multi-disciplined scientific review" would be too "labor-intensive and time-consuming" given the "large volume of [filed] applications" and instead argued only a "screen[ing]" process was warranted. *Id.*

**STANDARD OF REVIEW**

When an ENDS manufacturer challenges an MDO, the TCA requires this Court's review be conducted pursuant to the APA, 5 U.S.C. §706(2)(A). Specifically, the Court must evaluate whether the MDO was "arbitrary,

24

capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* Because Petitioners also challenge the lawfulness of the MDO under the TCA itself and the Due Process Clause of the Fifth Amendment, the Court must also determine whether the MDO is: (i) contrary to constitutional right, power, privilege, or immunity; (ii) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or (iii) without observance of procedure required by law. 5 U.S.C. §§706(2)(B)-(D).

## SUMMARY OF ARGUMENT

This Court has repeatedly found Respondent U.S. Food and Drug Administration ("FDA") defied administrative law when denying marketing authorization for Electronic Nicotine Delivery System ("ENDS") products under the Family Smoking Prevention and Tobacco Control Act ("TCA"). Initially, two orders stayed FDA denials, with an *en banc* decision finding extensive violations of the TCA, Administrative Procedure Act ("APA"), and the Due Process Clause of the Fifth Amendment. *Wages and White Lion Invs., LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024) ("*Wages*") (*en banc*); *R.J. Reynolds Vapor Co. v. FDA*, 65 F.4th 182 (2023) ("*RJR*") (stay); *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130 (5th Cir. 2021) (stay).

Unfortunately, FDA has refused to comply. It has continued to issue marketing denial orders ("MDOs") for non-tobacco flavored ENDS, including

25

menthol-flavored products, on the same grounds that this Court has already found unlawful. In fact, this Court in just the last month has vacated outright or entered stays pending judicial review of the same type of marketing denial orders ("MDO") based on the controlling precedent in *Wages*. *See, e.g.*, *SWT Global Supply, Inc. v. FDA*, No. 21-60762, 2024 WL 3595387 (5th Cir. July 31, 2024) (vacatur in consolidated cases); *Vertigo Vapor, Inc. v. FDA*, No. 24-60332 (Aug. 16, 2024) (ECF 45-1) (stay).

As to the instant case, FDA recently issued an MDO for "open-system" bottled e-liquids manufactured and/or sold by Petitioners NicQuid, LLC ("NicQuid") and Wood Creek Vapory. FDA did so without conducting a full scientific review because NicQuid's Premarket Tobacco Product Application ("PMTA") did not contain a long-term study that FDA never told manufacturers was required. This is the same rationale used to reject PMTAs for over one-million non-tobacco flavored ENDS, including applications for Wages and RJR. And FDA issued the MDO without considering FDA's own evidence showing minors do not use NicQuid's products and NicQuid's test results showing they are substantially less risky than traditional cigarettes.

In this petition, Petitioners make the following arguments:

1.     FDA failed to give NicQuid fair notice that it would be required to submit a highly specific, long-term study – *i.e.*, a randomized controlled trial, a

26

longitudinal cohort study, or similar (but unspecified) study (the "comparative efficacy study" requirement) – that addressed whether NicQuid's non-tobacco flavored ENDS, including menthol-flavored, are better at helping adult smokers quit smoking than NicQuid's tobacco-flavored products.

Before NicQuid filed its PMTA in September 2020, FDA provided substantial guidance and direction on the extensive information and data that manufacturers would need to submit in order to satisfy the TCA's "appropriate for the protection of the public health" ("APPH") standard and obtain marketing authorization. At no point, however, did FDA ever mention a comparative efficacy study or that it would be required to avoid an *automatic* MDO. Moreover, FDA indicated to manufacturers that menthol-flavored ENDS, and in particular e-liquids that would be used in "open-system" vaping devices, presented less risk than other types of ENDS and thus would have a less burdensome path to market authorization. But FDA eventually jettisoned all of that and denied PMTAs for over one million non-tobacco flavored ENDS based on the lack of any comparative efficacy studies, including NicQuid's products – what this Court called in *Wages* a "regulatory switcheroo." 90 F.4th at 362.

As an *en banc* panel of this Court determined in *Wages*, this constituted arbitrary and capricious decision-making under the Administrative Procedure

27

Act ("APA"), as well as a violation of the Due Process Clause of the Fifth Amendment, given there was no adequate notice of the comparative efficacy study requirement, FDA failed to explain its change in position as to what evidence would satisfy the APPH standard, and FDA ignored the legitimate reliance interests of manufacturers like NicQuid.

2. The MDO violates the TCA and is thus *ultra vires*. The TCA defines APPH in broad and sweeping terms, and requires FDA to grant marketing authorization if it determines the subject product is APPH. Under the statute, information and data relevant to any APPH determination includes "risks and benefits" of the product to the "population as a whole" (*i.e.*, adults, minors, users, non-users, etc.). It explicitly requires each PMTA to include data on numerous issues like health risks, product constituents, marketing plans (including steps taken to protect against underage access and use), and a product's impact on tobacco use initiation and cessation. The TCA then instructs FDA to make an APPH determination "on the basis of information submitted to FDA" and any other data FDA deems relevant. Accordingly, the TCA envisions a holistic, multi-factored APPH analysis that demands a full substantive, scientific review of an application. The TCA does not allow FDA, as it did here, to skip entirely any scientific review and instead conduct only an extremely limited "targeted review" (FDA's words) of a PMTA.

28

3. The MDO violates the APA because FDA largely ignored without explanation extensive data establishing NicQuid's products meet the TCA's APPH standard. Despite having previously advised manufacturers that such information was relevant to an APPH determination, FDA never discussed: (i) NicQuid sales data, as well as FDA's own multi-year survey data, demonstrating that underage consumers are not using NicQuid's ENDS; (ii) a March 2020 consumer use survey showing NicQuid's customers are using its products, including menthol-flavored ENDS, to move away from combustible cigarettes; and (iii) product testing results establishing that NicQuid's ENDS pose far less health risk than traditional cigarettes and other tobacco products.

4. The MDO violates the TCA and APA because FDA did not comply with notice-and-comment procedures. As this Court held in *Wages* and *RJR*, FDA has essentially imposed a *de facto* ban on all flavored ENDS, including menthol-flavored products, through the comparative efficacy study requirement. However, a flavor ban amounts to a "tobacco product standard" under the TCA, which in turn, must be promulgated through the TCA's own notice-and-comment procedures. Moreover, as FDA staff had virtually no discretion to grant marketing authorization if a comparative efficacy study was not included in a PMTA, it was also obligated to comply with the APA's rulemaking procedures. FDA did not do either.

29

5.      FDA unlawfully applied the MDO to NicQuid's zero-nicotine products and a tobacco-flavored product.  Zero-nicotine products are not subject to the TCA if the manufacturer does not intend them to be used with other tobacco products.  FDA did not provide any evidence in the MDO or otherwise that NicQuid had such intent.  In fact, the PMTA contained evidence to the contrary.  Moreover, FDA inexplicably applied the comparative efficacy study requirement to a tobacco-flavored product even though under no circumstances would it make sense to do so.  That type of study compares non-tobacco flavored and tobacco-flavored products, not a tobacco-flavored product against itself.

## ARGUMENT

### I.      FDA Failed To Give NicQuid Fair Notice Of The Comparative Efficacy Study Requirement And Otherwise Acted In An Arbitrary And Capricious Manner By Issuing The MDO

This Court found in *Wages* and *RJR* that FDA wholly failed to give manufacturers of non-tobacco flavored ENDS, including menthol products, fair notice of the grounds underlying the MDOs, including the comparative efficacy test requirement.  "[A]gencies must give notice of conduct [it] 'prohibits or requires' and cannot 'surprise' a party by penalizing it for good faith reliance" on its prior positions.  *RJR*, 65 F.4th at 189 (citation omitted);

*see also Wages*, 90 F.4th at 374 (noting that the "fair notice doctrine is rooted in the Fifth Amendment's Due Process Clause.").

Before the 2020 PMTA filing deadline, FDA repeatedly told manufacturers – through PMTA and enforcement guidance, a proposed PMTA rule, and public meetings – that applicants would not be required, particularly on pain of an *automatic* MDO, to submit long-term studies. Instead, FDA said "actual use" studies/consumer surveys and published literature could support an APPH finding. FDA also said applicants were free to select comparator products for comparison studies. *Supra* 14. However, FDA never told applicants it was an absolute requirement that a PMTA contain a long-term test specifically comparing the cessation benefits of their non-tobacco and tobacco-flavored products. *Wages*, 90 F.4th at 374-81. Indeed, the MDO "move[d] the scientific goalposts" when it set forth, for the first time, the comparative efficacy study requirement. *Id.* at 379.

Moreover, this Court held that FDA did not adequately explain its change in position as to open-system devices, menthol-flavored ENDS, and underage marketing/access restrictions. Specifically, the "APA demands that the agency display an awareness that it is changing position…An agency may not, for example, depart from a policy *sub silentio*." *Wages*, 90 F.4th at 381 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) (internal

31

quotations omitted); *id.* at 383-84 (court also holding FDA failed to explain its shift to the comparative efficacy study requirement).

In the 2020 enforcement guidance and 2021 TPL template, FDA characterized open-systems, due to design features unattractive to youth, and menthol-flavored ENDS, because of their "unique" potential to help addicted smokers, as relatively less risky products. *Supra* 14-16; *see Wages*, 90 F.4th at 367. FDA also listed "adequate measures" that open-system manufacturers could employ to effectively reduce risk to youth. *Supra* 11-12. This Court found, however, FDA never explained its change in position when it imposed the comparative efficacy test to all flavored products, regardless of device-type and notwithstanding the petitioners' implementation of "adequate measures." *Wages*, 90 F.4th at 384; *RJR*, 65 F.4th at 190 (both decisions requiring an agency to acknowledge when it abandons a prior policy and to justify the change). Significantly, NicQuid's MDO is the first time FDA has applied such test to an open-system, menthol-flavored ENDS. NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A092-100) (A097-98).

Finally, when an agency adopts a new policy, it must account for legitimate reliance interests. *Wages*, 90 F.4th at 384-85; *RJR*, 65 F.4th at 189-91. Here, NicQuid relied in good faith on all of FDA's prior representations. NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A092-100). It submitted PMTAs

32

containing, among other evidence, the very types of literature reviews, survey data, and exposure testing FDA said could support an APPH finding, but now suddenly maintains are irrelevant. *Supra* 17-22. As this Court held, nowhere in FDA's guidance, rules, or other public statements did it acknowledge manufacturers' legitimate reliance on FDA's statements leading up to the PMTA filing deadline. *Wages*, 90 F.4th at 385-86; *RJR*, 65 F.4th at 190.

And agencies must account for such interests by considering alternatives to the new policy. *RJR*, 65 F.4th at 191. Indeed, FDA could have easily sent a deficiency letter to NicQuid requesting a comparative efficacy study. *Supra* 16. (FDA indicating it would issue one deficiency letter before making a marketing decision); *RJR*, 65 F.4th at 191. Or FDA could have granted marketing authorization but required post-market surveillance to ensure minors have not initiated use of NicQuid's products. 21 U.S.C. §387j(f). This would have made complete sense as FDA's own data show minors are not using NicQuid's ENDS. *Supra* 22. But FDA did not consider either option.

As the *en banc* decision in *Wages* is controlling, *U.S. v. Avants*, 367 F.3d 433, 441 (5th Cir. 2004), the MDO should be vacated on this basis alone.[11]

---

[11] The U.S. Supreme Court recently granted a writ of certiorari in *Wages*. 2024 WL 3259693 (No. 23-1038) (July 2, 2024). However, *Wages* remains "binding precedent unless and until the Supreme Court says otherwise." *Chamber of Commerce of the U.S. v. SEC*, 85 F.4th 760, 768 n.4 (5th Cir. 2023).

## II.    The MDO Violates The TCA And Is Ultra Vires

By refusing to conduct a full scientific review of NicQuid's PMTAs, FDA violated the TCA. 5 U.S.C. §§706(2)(A), (2)(C), (2)(D); *see City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) (when agency exceeds power delegated by Congress it acts *ultra vires*). Under the statute, once FDA receives a complete PMTA, it must do more than a cursory evaluation; it must review and evaluate the application's contents in its entirety. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2264 (2024) (Courts must employ "traditional tools of statutory construction" when determining the "best" statutory interpretation and not defer to an agency's policy-laden approach).

The TCA's plain language provides that a PMTA shall be denied if "*upon the basis of information submitted* to [FDA]…and any other information before [FDA]" the applicant has not demonstrated APPH. 21 U.S.C. §387j(c)(2) (emphasis added). The statute defines APPH in broad terms with respect to "risks and benefits to the population *as a whole*," including "users and nonusers of tobacco products." 21 U.S.C. §387j(c)(2) (emphasis added). In this context, the statute enumerates numerous forms of evidence that must be in any PMTA, including data on health risks, ingredient and additive information, manufacturing practices, product samples, labeling specimens, and any other information required by FDA. 21 U.S.C. §387j(b)(1).

34

Congress, therefore, intended that any APPH determination be based on a multi-faceted analysis weighing all data and information in a PMTA. FDA must consider the *whole* population, including not only underage nonusers and adult users, as the MDO purports to, but also any other demographics that might be impacted by an ENDS product (*e.g.*, adult non-users, underage cigarette smokers, etc.).

Moreover, FDA must gauge not only the relative cessation benefits to adult smokers, which is the MDO's focus, but also all other *risks and benefits* of a given product, including health factors, such as whether a product results in relatively less exposure to hazardous constituents. *See* 21 U.S.C. §387g(a)(4) (defining APPH in context of tobacco control standards as including reduction or elimination of harmful constituents). Indeed, this is how FDA has interpreted APPH in PMTA regulations and guidance. *Supra* 7-10.

All of this is consistent with Congress's choice of words adopting the APPH standard. Congress did not employ any words or terms of limitation. Rather, they used the word "appropriate" – "the classic broad and all-encompassing term that naturally and traditionally includes consideration of all the relevant factors." *Michigan v. EPA*, 576 U.S. 743, 752 (2015) (citation omitted). Further, common definitions of "public health" are broad and refer to protecting the "community" as a whole; they are not otherwise restricted to

35

certain persons or population demographics.[12]  And nowhere in the TCA is there any indication that FDA was authorized to abandon full scientific review and instead could deny a PMTA (and, in fact, PMTAs covering over one million products) based on the alleged absence of a few selected data points.

A PMTA might be so deficient on its face that FDA should not have to spend resources on any further review.  But that is not the case here.  FDA conducted two screening exercises of NicQuid's applications and determined the PMTAs were ready for scientific review.  Appx00195-00216 (acceptance letter); Appx00150-00171 (filing letter).  At this point, FDA was statutorily obligated to consider all of the PMTA's contents.  But it did nothing of the sort.  Instead, it conducted a "targeted review" that only asked whether there was a comparative efficacy study, queried whether NicQuid had implemented a "novel" form of device access restriction, and considered some unspecified cross-sectional studies.  *Supra* 24.

Because FDA did not follow the TCA in issuing the MDO, it acted contrary to law and its illegal actions must be set aside.  *League of United Latin Am. Citizens v. Regan*, 996 F.3d 673, 691 (9th Cir. 2021) (failure of agency to

---

[12] Merriam-Webster Dictionary, https://tinyurl.com/55p876pn ("the art and science dealing with the protection and improvement of community health"); American Heritage Dictionary, https://tinyurl.com/ywxdthby ("The science and practice of protecting and improving the health of a community").

conduct safety review of pesticide was *ultra vires* when citizen petition contained "sufficient evidence to undertake" such review).

### III. FDA Failed To Weigh Evidence Highly Relevant To An APPH Finding And Thus The MDO Is Arbitrary and Capricious

An agency "must examine the relevant data" and "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *BNSF Railway Co. v. FRA*, 62 F.4th 905, 910 (5th Cir. 2023). A court "must set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error in judgment." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021). An "agency cannot ignore evidence that undercuts its judgment; and it may not minimize such evidence without adequate explanation." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018). Here, in reviewing NicQuid's PMTA, FDA largely ignored evidence without explanation that is clearly relevant to an APPH determination.

**First**, FDA argued in the TPL that typical marketing and access restrictions do not adequately mitigate the risk to underage consumers and only novel device access restrictions would suffice. Appx00031. FDA never addressed, however, the product-specific data showing NicQuid's restrictions have worked. FDA told manufacturers actual sales data and national survey

results would help determine risk to youth. *Supra* 12; *Wages*, 90 F.4th at 364-65. So NicQuid dutifully submitted extensive sales data for its ENDS products between December 2018-August 2019. A summary of that data showed the vast majority of NicQuid's consumers were 25 years or older and only 0.69% of consumers fell within the 18-24 years-old (young adult) range. Even more telling, while the TPL relied on FDA's own NYTS survey results to establish that underage consumers use flavored products, it turned a blind eye to NYTS results establishing that no high-school or middle-school respondent between 2021-2023 reported having used a NicQuid product. *Supra* 22; NicQuid Stay Mot., Eley Decl. (ECF 14-2) (A104).

**Second**, despite conceding that national surveillance data suggest there is "variability in the popularity of device types among youth," the TPL argued that such popularity is fluid and gives an example of underage consumers switching from one type of closed-system following increased enforcement activity against those products to a new type of closed-system (*i.e.*, disposables). In only one sentence, FDA cited to 2021 NYTS results showing minors have also reported using open-systems, Appx00021, but neglected to indicate the use rate was only 9.0%. Appx00011. The TPL then failed to mention this rate has substantially decreased the last two years, even in the

face of enhanced enforcement against disposables,[13] to 6.7% for NYTS 2022 and 5.9% in 2023. *Supra* note 10. This is not surprising as FDA has long recognized open-systems do not have the same design features as closed-systems which are found particularly attractive by youth. *Supra* 15; *Wages*, <mark>90 F.4th at 367-68</mark> (describing key differences between open- and closed-system ENDS).

FDA's own data show minors are not using NicQuid's products, despite having been sold for years, and youth are not migrating to open-systems. FDA requested these data as relevant to APPH, and indeed they should result in a dramatic tipping of the scales in favor of an APPH finding. But FDA never weighed this evidence or explained why it was ignored.

**Third**, on the benefits side of the ledger, despite instructing manufacturers that they could submit actual use studies and published literature (*e.g.*, RCTs) to address potential cessation, *supra* 12-14, the TPL never weighed the results of NicQuid's March 2020 consumer use survey. That survey indicated adult former smokers were using NicQuid's ENDS products, including menthol/mint-flavored products (and at higher rates than tobacco-flavored ENDS), and they were using ENDS to stay away from

---

[13] *See*, *e.g.*, https://tinyurl.com/yhtjwew7 (FDA press release regarding December 2020 seizure of 33,000 flavored disposables).

combustible cigarettes. *Id.* The TPL also never specifically addressed published RCTs showing ENDS help smokers quit. All of this supports a finding of APPH, yet FDA gives it short shrift.

**Fourth**, although the TPL acknowledged that ENDS "are likely to have fewer and lower concentrations" of HPHCs than combustible cigarettes, FDA argued it must confirm product-specific data on a "case-by-case basis." Appx00024. Yet FDA did not consider NicQuid's aerosol data showing that its ENDS present substantially lower health risks from HPHC exposures than combustible cigarettes and an FDA-approved menthol-flavored, heat-not-burn product. Appx00317-00322. FDA does not cite to any discussion or analysis in the TPL of any HPHC comparison data or consider such results in the context of the March 2020 consumer survey showing former adult smokers are in fact using NicQuid's products to stay away from combustible cigarettes. FDA must explain its rationale based on all relevant evidence instead of brushing aside data indicating NicQuid's users are, in reality, significantly reducing their exposure to HPHCs relative to other tobacco products.[14]

---

[14] Appendix B to the MDO indicates that FDA reviewed updated HPHC data submitted by NicQuid through a PMTA amendment in June 2021. Appx000007. However, there is no analysis or discussion in the TPL of such data.

40

FDA admitted as the risk to youth goes down, so does the magnitude of adult benefit needed to show APPH. *Supra* 23. Yet FDA never discussed these data – or any other information in the PMTA – even though multiple lines of evidence prove minors are not using NicQuid's ENDS and that they are reduced harm products. FDA agreed an APPH finding requires a "balancing" of *all* risks and benefits, *supra* 8, but without explanation failed to do so. *RJR*, 65 F.4th at 191-92 (faulting FDA for ignoring data on reduced harm and low youth use rates).

In fact, FDA was motivated by at least one factor in the MDO that is entirely irrelevant to the APPH standard. FDA griped that a "multi-disciplined scientific review" would be too time-consuming given the number of PMTAs that were filed. *Supra* 24. However, efficiency goals "cannot save an arbitrary agency policy." *Judulang v. Holder*, 565 U.S. 42, 63-64 (2011) (holding irrelevant agency goal to save time and money); *Michigan*, 576 U.S. at 750 (efficiency is no substitute for "reasoned decision-making").

In the end, FDA completely abandoned the all-encompassing PMTA review process set out by Congress in the TCA and FDA's own, long-standing interpretation of APPH. *Supra* 7-10. FDA said it must consider "all" information in a PMTA and evaluate the application on an "individualized" basis. *Supra* 8. FDA characterized APPH broadly, describing it as a "multi-

41

disciplinary" and "weighing" approach, and noting it must "consider many factors" going to the "population as a whole" and eschew any notion that an applicant must meet specific criteria or else be denied. *Supra* 8-9. FDA's "targeted review" represents a wholesale failure in this regard.

### IV.  FDA Instituted A De Facto Restriction Or Ban On Non-Tobacco Flavored ENDS, Including Menthol-Flavored Products, In Violation Of Notice-And-Comment Procedures

As this Court found in *Wages* and *RJR*, FDA has unlawfully applied the comparative efficacy test to effectively achieve a *de facto* ban on non-tobacco flavored ENDS, including menthol-flavored products, without complying with the TCA's notice-and-comment procedures. The TCA requires notice-and-comment rulemaking when adopting a "tobacco product standard." 21 U.S.C. §§387g(c)-(d). Congress further indicated that a restriction or ban on flavors is a tobacco product standard. 21 U.S.C. §§387g(a)(1)-(4); *Wages*, 90 F.4th at 384 n.5; *RJR*, 65 F.4th at 192. Indeed, FDA conceded as much when it issued in 2022 a proposed rule for a tobacco product standard that would have banned menthol as a characterizing flavor in cigarettes. 87 Fed. Reg. 26454, 26456 (May 4, 2022); *see* Appx00251 (2020 enforcement guidance stating that "restricting or eliminating the use of flavors" in ENDS would be a "tobacco product standard").

Yet, without notice-and-comment, FDA weaponized the comparative efficacy test to ensure MDOs would be issued for virtually 100% of all non-tobacco flavored ENDS.  *RJR*, 65 F.4th at 192; *Wages*, 90 F.4th at 384 n.5; *see* https://tinyurl.com/2sdcmtr2 (FDA tracker indicating MDOs have been issued for over 1.2 million ENDS).  *Wages* held "FDA unquestionably failed to follow §387g's notice-and-comment obligations before imposing its *de facto* ban on flavored cigarettes."  90 F.4th at 384 n.5.  Although FDA recently approved four menthol-flavored, closed-system ENDS manufactured by NJOY, https://tinyurl.com/m6d846d3, those ENDS constitute a mere 0.000333% of the total number of products denied marketing authorization pursuant to the comparative efficacy test requirement.

As explained in *RJR*, the comparative efficacy test as applied also amounts to a substantive rule requiring notice-and-comment rulemaking.  That test was the result of a "fatal flaw" policy adopted in 2021 in which FDA reviewers were instructed to deny any PMTA that did not contain such data.  Although FDA has claimed the internal memos memorializing that approach have been rescinded, this Court found it "has remained in full effect for all non-tobacco flavored" ENDS.  *RJR*, 65 F.4th at 193.  In this Circuit, whether FDA's comparative efficacy approach is a substantive rule "turns on whether an agency intends to bind *itself* to a particular legal position."  *Id.* (italics in

43

original) (citations omitted). "An action is binding if it appears on its face to be binding, is applied by the agency in a way that indicates it is binding, or retracts an agency's discretion to adopt a different view of the law." *Id.* (citations omitted).

As this Court held, the comparative efficacy test is binding on FDA staff, has been applied in practice as if it is binding, and has impacted the rights of thousands of applicants. *Id.* at 192-94. *Texas v. U.S.*, 809 F.3d 134, 171-73 (5th Cir. 2015) (finding immigration policy binding and thus requiring notice-and-comment rulemaking because it was applied in same manner across 95% of thousands of applications). In fact, even if the comparative efficacy test requirement does not constitute a tobacco product standard, notice-and-comment rulemaking would still be required under the APA. 5 U.S.C. §553 (requiring agencies to give public notice and allow interested persons to submit comments); 5 U.S.C. §706(2) (allowing courts to hold unlawful and set aside agency action "found to be…without observance of procedure required by law"); *Texas*, 809 F.3d at 171 (applying APA notice-and-comment rules to policy that had been enforced as if it was binding).

To be clear, this is not FDA coincidently reaching the same conclusion after a case-by-case evaluation of hundreds-of-thousands of PMTAs for non-tobacco flavored ENDS. Rather, FDA applies the comparative efficacy test, as

it did here, in check-the-box fashion even before conducting a full scientific review. This is nothing more than a vehicle to institute a flavor ban and avoid rulemaking procedures.

## V.    FDA Unlawfully Applied The MDO To Zero-Nicotine Products And A Tobacco-Flavored Product

The TCA only applies to products derived from tobacco and/or that contain nicotine from any source, or that are otherwise a "component" or "part" of a tobacco product. 21 U.S.C. §321(rr). Five of NicQuid's products listed in the MDO have zero-nicotine options and are not made or derived from tobacco. Appx000005-000006. Moreover, as FDA stated in the June 2019 PMTA guidance, zero-nicotine ENDS that are "not intended or reasonably expected to be mixed with liquid nicotine or materials made or derived from tobacco" are not subject to the TCA. Appx00369-00370. NicQuid clearly does not intend for its zero-nicotine products to be mixed with nicotine or tobacco. A consumer wishing to use these flavors with nicotine would simply purchase one of NicQuid's nicotine options.

In any event, neither the MDO nor the TPL claimed that NicQuid intended those ENDS to be covered tobacco products or provided any evidence in support. And it could not. NicQuid's PMTA explained why the zero-nicotine ENDS were included in the application – per FDA's

45

recommendation, they were used in a bracketing approach as one extreme of nicotine concentration that was tested for HPHCs. *Supra* 21.

Moreover, the MDO applies to NicQuid's tobacco-flavored ENDS (Sweet Leaf).[15]  Appx000006.  This makes no sense and further demonstrates FDA did not bother to review the entire application.  The MDO was issued because NicQuid did not submit a study comparing the cessation efficacy of its non-tobacco-flavored *and* tobacco-flavored products; comparing two tobacco-flavored products (essentially comparing a tobacco-flavored product against itself) would not provide the requested comparative efficacy data.  Appx000002.  The TPL also stated this test is not required for tobacco-flavored ENDS because the known risk to youth "is lower compared to flavored ENDS."  Appx00011.  The TPL conceded marketing and access restrictions like those proposed by NicQuid "could mitigate that more limited risk and impact the overall net benefit assessment."  Appx00012.  Not surprisingly, FDA did not explain in either the MDO nor the TPL how the comparative efficacy study requirement could ever be applied to a tobacco-flavored ENDS.

---

[15] It is also clear from the PMTA that the characterizing flavor of the Sweet Leaf product is tobacco only (*see* PMTA Sweet Leaf ingredients list).  NicQuid Stay Reply, Exhibit 2 (ECF 33-2) (exhibit under seal).

## CONCLUSION

This Court should grant the Petition for Review, and vacate and remand the MDO for further agency proceedings.

Dated: September 3, 2024

/s Eric P. Gotting
Eric P. Gotting
KELLER AND HECKMAN LLP
1001 G Street, NW
Suite 500 West
Washington, DC 20001
Telephone: (202) 434-4100
Facsimile: (202) 434-4646
gotting@khlaw.com
*Counsel for Petitioners*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify the foregoing complies with the length limitations of Federal Rule of Appellate Procedure ("Rule") 27(d)(2)(A) because it is 9611 words, excluding the parts that are exempted under Rule 32(f).  It complies with the typeface and type-style requirements of Rule 32(a)(5) and Rule 32(a)(6) because it is printed in 14-point Calisto MT font.


/s Eric P. Gotting
Eric P. Gotting

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2024, a true and correct copy of the foregoing was filed via the Court's CM/ECF system and served via electronic filing upon all counsel of record in this case.

/s Eric P. Gotting
Eric P. Gotting