**No. 24-60272**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

NICQUID, L.L.C.; WOOD CREEK VAPORY,

*Petitioners,*

*v.*

FOOD & DRUG ADMINISTRATION; MARTY MAKARY, Commissioner,
U.S. Food and Drug Administration; ROBERT F. KENNEDY, JR., Secretary,
U.S. Department of Health and Human Services,

*Respondents.*

_____

On Petition for Review of a Final Marketing Denial Order
by the U.S. Food and Drug Administration

_____

### FINAL BRIEF FOR RESPONDENTS

_____

*Of Counsel:*

**MICHAEL B. STUART**
 *General Counsel*

 *U.S. Department of Health and
 Human Services*

**SEAN R. KEVENEY**
 *Chief Counsel*
**WENDY S. VICENTE**
 *Deputy Chief Counsel, Litigation*

**KWABENA AKOWUAH**
 *Associate Chief Counsel*

*U.S. Food and Drug Administration*

ERIC D. McARTHUR
 *Deputy Assistant Attorney General*

JOSHUA M. KOPPEL
KEVIN B. SOTER
 *Attorneys, Appellate Staff
 Civil Division, Room 7222
 U.S. Department of Justice
 950 Pennsylvania Ave., NW
 Washington, DC 20530
 (202) 305-1754*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required because the U.S.

Food and Drug Administration is a government agency. 5th Cir. R. 28.2.1.

s/ *Kevin B. Soter*
Kevin B. Soter

## STATEMENT REGARDING ORAL ARGUMENT

This case raises statutory and administrative disputes, and the government stands ready to present oral argument as needed.

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE ISSUES ............................................................ 3

STATEMENT OF THE CASE................................................................ 4

     A.    Statutory Background.............................................................4

     B.    Regulatory Background..........................................................6

     C.    Procedural History ...............................................................12

SUMMARY OF ARGUMENT............................................................... 18

STANDARD OF REVIEW ..................................................................... 21

ARGUMENT............................................................................................ 22

I.     FDA appropriately denied marketing authorization based on a
     lack of evidence that marketing NicQuid's products would be
     appropriate for the protection of the public health. ........................... 22

     A.    The record amply supports FDA's determination. .....................22

     B.    FDA did not err in denying authorization to market
          NicQuid's zero-nicotine and Sweet Leaf products. ...................35

II.    Petitioners' change-in-position arguments cannot be squared
     with the Supreme Court's decision in *Wages*.......................................... 41

III.   FDA did not violate any procedural requirements by
     conducting a comparative analysis........................................................... 52

IV.   NicQuid cannot petition for review in this Circuit. ......................... 66

iii

CONCLUSION ............................................................................................ 68

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:**                                             **Page(s)**

*Amerada Petroleum Corp. v. Federal Power Comm'n,*
338 F.2d 808 (10th Cir. 1964) ............................................................ 67

*American Airlines, Inc. v. Department of Transp.,*
202 F.3d 788 (5th Cir. 2000) ................................................. 56, 57, 62

*BCCA Appeal Grp. v. EPA,*
355 F.3d 817 (5th Cir. 2003) ............................................................ 37

*Bidi Vapor LLC v. FDA,*
134 F.4th 1282 (11th Cir. 2025) ...................................................... 61

*Biestek v. Berryhill,*
587 U.S. ............................................................................................. 41

*Camp v. Gress,*
250 U.S. 308 (1919) .......................................................................... 67

*Camp v. Pitts,*
411 U.S. 138 (1973) .......................................................................... 27

*Delaware Dep't of Nat. Res. & Env't Control v. EPA,*
895 F.3d 90 (D.C. Cir. 2018) ............................................................ 37

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009) ....................................................................43, 44

*FDA v. R.J. Reynolds Vapor Co.,*
606 U.S. 226 (2025) .......................................................................... 67

*FDA v. Wages & White Lion Invs., LLC,*
604 U.S. 542 (2025) .............................. 2, 4, 5, 6, 7, 8, 9, 11, 18, 20, 21, 22, 24,
25, 26, 27, 34, 35, 41, 42, 43, 44, 45, 46, 47,
49, 50, 51, 52, 53, 54, 55, 56, 63, 64

*Fontem US, LLC v. FDA,*
82 F.4th 1207 (D.C. Cir. 2023) ........................................................ 60

*Gripum, LLC v. FDA,*
47 F.4th 553 (7th Cir. 2022) ............................................................ 56

*ITServe All., Inc. v. U.S. Dep't of Homeland Sec.,*
71 F.4th 1028 (D.C. Cir. 2023) .................................................. 62

*Logic Tech. Dev. LLC v. FDA,*
84 F.4th 537 (3d Cir. 2023), *cert. denied,*
145 S. Ct. 1921 (2025) .................................................. 43, 49, 52, 65

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) .................................................. 34

*Macy's Inc. v. NLRB,*
824 F.3d 557 (5th Cir. 2016) .................................................. 57

*Miguel-Miguel v. Gonzales,*
500 F.3d 941 (9th Cir. 2007) .................................................. 57

*Mobil Expl. & Producing N. Am., Inc. v. FERC,*
881 F.2d 193 (5th Cir. 1989) .................................................. 59

*Munoz v. State Farm Lloyds of Tex.,*
522 F.3d 568 (5th Cir. 2008) .................................................. 37

*National Fam. Farm Coal. v. U.S. EPA,*
966 F.3d 893 (9th Cir. 2020) .................................................. 67

*Neustar, Inc. v. FCC,*
857 F.3d 886 (D.C. Cir. 2017) .................................................. 57

*Nicopure Labs, LLC v. FDA,*
944 F.3d 267 (D.C. Cir. 2019) .................................................. 7

*NLRB v. Bell Aerospace Co.,*
416 U.S. 267 (1974) .................................................. 56, 58, 61

*R.J. Reynolds Vapor Co. v. FDA,*
65 F.4th 182 (5th Cir. 2023) .................................................. 52, 64

*SEC v. Chenery Corp.,*
332 U.S. 194 (1947) .................................................. 56

*Seven Cnty. Infrastructure Coal. v. Eagle County,*
605 U.S. 168 (2025) .................................................. 34

*Smith v. Lyon,*
   133 U.S. 315 (1890) .......................................................... 67

*SWT Glob. Supply, Inc. v. FDA,*
   139 F.4th 957 (8th Cir. 2025) ...................... 29, 43, 46, 47, 52

*Tearney v. NTSB,*
   868 F.2d 1451 (5th Cir. 1989) ........................................ 60

*Trump v. CASA, Inc.,*
   606 U.S. 831 (2025) ........................................................ 68

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952) .......................................................... 37

*United States v. Segura,*
   747 F.3d 323 (5th Cir. 2024) .......................................... 64

*Velasco-Giron v. Holder,*
   773 F.3d 774 (7th Cir. 2014) .......................................... 58

*Wages & White Lion Invs., LLC v. FDA,*
   90 F.4th 357 (5th Cir. 2024) (en banc) ................... 17, 63, 64

**Statutes:**

Administrative Procedure Act (APA),
   5 U.S.C. § 706(2)(A) ...................................................... 21

Family Smoking Prevention and Tobacco Control Act,
   Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009) ...................4
      21 U.S.C. § 387a(b) ...................................................... 5
      21 U.S.C. § 387e(j)(3) ................................................. 55
      21 U.S.C. § 387g ..........................................................61
      21 U.S.C. § 387g(a)(1)(A) ........................................61, 62
      21 U.S.C. § 387g(a)(4) ..................................................60
      21 U.S.C. § 387g(c) ..................................................... 60
      21 U.S.C. § 387j ........................................................ 58
      21 U.S.C. § 387j(a)(1)-(2) ............................................. 5
      21 U.S.C. § 387j(a)(2) ................................................. 35

21 U.S.C. § 387j(b) ........................................................................... 55

21 U.S.C. § 387j(b)(1)(A) ......................................................... 44, 53

21 U.S.C. § 387j(c) .................................................................... 56, 61

21 U.S.C. § 387j(c)(2) ....................................................................... 6

21 U.S.C. § 387j(c)(2)(A) ........................................ 1, 5, 13, 18, 22, 61

21 U.S.C. § 387j(c)(2)(D) ................................................................ 60

21 U.S.C. § 387j(c)(4) ......................................................... 1, 6, 53-54

21 U.S.C. § 387j(c)(5) ....................................................................... 6

21 U.S.C. § 387k(*l*)(1) .................................................................... 55

21 U.S.C. § 387*l*(a)(1) .................................................................... 66

21 U.S.C. § 387*l*(a)(1)(B) ................................................................. 3

21 U.S.C. § 387*l*(b) ....................................................................... 21

21 U.S.C. § 321(rr)(1) ...................................................... 5, 35, 36, 38

**Regulation:**

21 C.F.R. § 1140.3 .......................................................................... 38

**Other Authorities:**

Jan Birdsey et al., *Tobacco Product Use Among U.S. Middle
    and High School Students – National Youth Tobacco Survey, 2023*,
    72 Morbidity & Mortality Wkly. Rep. 1173 (2023) .......................28

FDA, *E-Cigarettes Authorized by the FDA* (July 2025),
    https://perma.cc/S6GJ-NBJ3 .........................................11, 12, 63

FDA, *FDA Authorizes Marketing of Tobacco- and Menthol-
    Flavored JUUL E-Cigarette Products* (July 17, 2025),
    https://perma.cc/7PDN-MYCM.............................................12, 63

FDA, *Technical Project Lead (TPL) Review of PMTAs*
    (May 12, 2022), https://perma.cc/A9BC-H6R3...........................11

79 Fed. Reg. 23,142 (Apr. 25, 2014) ................................................. 8

81 Fed. Reg. 28,974 (May 10, 2016) ....................................... 7, 8, 38

NicQuid, *Sweet Leaf*, https://perma.cc/TJ64-JTTQ..........................................40

Press Release, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://perma.cc/63WX-GFBF ..............................................................12, 63

**INTRODUCTION**

The Family Smoking Prevention and Tobacco Control Act (TCA or Tobacco Control Act) prohibits marketing a new tobacco product without authorization from the U.S. Food and Drug Administration (FDA). The Act directs that FDA "shall deny" a marketing application unless the applicant shows that marketing the product would be "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A). In making that assessment, FDA must evaluate "the risks and benefits to the population as a whole." *Id.* § 387j(c)(4).

FDA properly applied this statutory standard in denying petitioner NicQuid, LLC's applications to market electronic cigarette products in a variety of flavors. FDA explained that flavored e-cigarettes like NicQuid's pose a significant risk to youth because flavoring increases the appeal of tobacco products to youth, makes the products more palatable for novice users, and can increase nicotine exposure, making it more likely that youth will initiate tobacco use and become regular tobacco users. And the agency found that NicQuid's applications lacked evidence demonstrating that its flavored e-cigarettes would provide a benefit to adult users that would be adequate to outweigh this significant risk to youth. NicQuid thus failed to

demonstrate that marketing its products would be appropriate for the protection of the public health, and FDA was required under the statute to deny the applications.

The agency's reasoning here closely tracks the reasoning that the Supreme Court upheld in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025), which also concerned applications to market flavored e-cigarettes.  Insofar as petitioners raise new arguments that aspects of FDA's analysis are arbitrary and capricious, they are generally asking this Court to improperly second-guess the agency's scientific determinations. Petitioners' assertion that they were unfairly surprised by FDA's approach to menthol-flavored e-cigarettes fails under the Supreme Court's analysis in *Wages*.  Meanwhile, petitioners' broader contention that FDA needed to proceed through rulemaking rather than adjudication ignores the Tobacco Control Act's express provisions for case-by-case review and background principles of administrative law that allow agencies to develop standards through rulemaking or adjudication.  The petition for review should be denied.

## STATEMENT OF JURISDICTION

FDA denied NicQuid's applications to market certain new tobacco products on May 3, 2024. *See* Appx.1-7. Petitioners timely petitioned for review. This Court has jurisdiction under 21 U.S.C. § 387*l*(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Whether FDA appropriately denied marketing authorization because NicQuid failed to show that the benefits of its e-cigarette products outweigh their substantial risk to youth so as to make their marketing "appropriate for the protection of the public health."

2. Whether FDA unlawfully changed its position regarding menthol e-cigarettes.

3. Whether FDA had to go through notice-and-comment procedures before reviewing applications to market flavored e-cigarettes for evidence that those products provide a comparative benefit, relative to tobacco-flavored e-cigarettes, at helping existing smokers substantially reduce or cease the use of combustible cigarettes.

4. Whether NicQuid properly petitioned for review in this Court even though its principal place of business is outside the Fifth Circuit.

## STATEMENT OF THE CASE

### A.    Statutory Background

The TCA established a comprehensive scheme for the regulation of tobacco products. Pub. L. No. 111-31, div. A, 123 Stat. 1776 (2009). The Act was predicated on Congress's findings that the "use of tobacco products by the Nation's children is a pediatric disease of considerable proportions," that "[v]irtually all new users of tobacco products are under the minimum legal age to purchase such products," and that an "overwhelming majority" of tobacco users "become addicted to the nicotine in those products before reaching the age of 18." *Id.* § 2(1), (4), (31), 123 Stat. at 1777, 1779. Congress further found that tobacco companies regard "young people" as a "crucial segment of the tobacco market," *id.* § 2(24), 123 Stat. at 1778, and that "past efforts" had not adequately "curb[ed] tobacco use by adolescents," *id.* § 2(6), 123 Stat. at 1777.

The Tobacco Control Act gave FDA "the power to regulate the manufacturing, marketing, sale, and distribution of tobacco products." *FDA v. Wages & White Lion Invs., LLC,* 604 U.S. 542, 551 (2025). The Act granted FDA immediate regulatory authority over "cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco," and allowed FDA

to also regulate "any other tobacco products" that the agency "by regulation deems to be subject to" the Act. 21 U.S.C. § 387a(b). The TCA, as amended, defines "tobacco product" as "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product." *Id.* § 321(rr)(1).

Congress made it unlawful to introduce in interstate commerce without FDA authorization any "new tobacco product" that was not commercially marketed in the United States as of February 15, 2007, or that was modified after that date. 21 U.S.C. § 387j(a)(1)-(2). As relevant here, the Act instructs that FDA "shall deny" a manufacturer's application to market a new tobacco product if the agency "finds that … there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health." *Id.* § 387j(c)(2)(A). The statute thus places the burden on the applicant to make the required showing. *See Wages*, 604 U.S. at 552. In determining whether an applicant has met that standard, FDA must evaluate "the risks and benefits to the population as a whole," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the

"likelihood that existing users of tobacco products will stop." 21 U.S.C. § 387j(c)(4).

FDA assesses an application based on "the information submitted" by the applicant and "any other information" before the agency. 21 U.S.C. § 387j(c)(2). The agency's determination must be based on "well-controlled investigations" or other "valid scientific evidence" that is "sufficient to evaluate the tobacco product." *Id.* § 387j(c)(5). The statute "leaves it to the FDA to decide what constitutes a 'well-controlled investigatio[n]' or other 'valid scientific evidence' that is 'sufficient.'" *Wages*, 604 U.S. at 572 (alteration in original).

### B.    Regulatory Background

1. Electronic nicotine delivery systems—"popularly known as electronic cigarettes, e-cigarettes, or vapes"—entered the American market in 2007. *Wages*, 604 U.S. at 553. In contrast to a "traditional combustible cigarette," which "contains shredded tobacco wrapped in paper" and produces nicotine-infused smoke when lit, "an e-cigarette contains a battery, a heating element or atomizer, a liquid nicotine reservoir, and a mouthpiece." *Id.* "When an e-cigarette user inhales through the device's

6

mouthpiece, the heating coil engages, and the liquid (called e-liquid or e-juice) turns into a nicotine-infused" aerosol. *Id.*

In 2016, FDA exercised its statutory authority to deem e-cigarettes and other products meeting the statutory definition of "tobacco product" subject to the Tobacco Control Act's requirements. 81 Fed. Reg. 28,974, 28,974 (May 10, 2016). The rulemaking was precipitated by "rampant and climbing" e-cigarette use "among middle and high school students." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 275 (D.C. Cir. 2019). FDA recognized that adults "currently using combusted tobacco products" may benefit from "completely switching" to e-cigarettes because the aerosol generated by e-cigarettes generally contains lower levels of toxicants than the smoke generated by traditional cigarettes. 81 Fed. Reg. at 29,030-31. FDA also found, however, that "inhaled nicotine" from e-cigarettes can be "as addictive as inhaled nicotine delivered by combusted tobacco products." *Id.* at 29,047. FDA noted that nicotine's effect on youth is particularly alarming: Research indicates that exposure to nicotine "can disrupt adolescent brain development," "decreas[e] attention performance[,] and increas[e] impulsivity." *Id.*

7

In light of this evidence, FDA recognized that the public-health impact of e-cigarettes depends upon "who uses the products and how." 79 Fed. Reg. 23,142, 23,147 (Apr. 25, 2014) (proposed rule). "If such products result in minimal initiation by children and adolescents while significant numbers of smokers quit, then there is a potential for the net impact at the population level to be positive." *Id.* "If, on the other hand, there is significant initiation by young people, minimal quitting, or significant dual use of combustible and non-combustible products, then the public health impact could be negative." *Id.*

2. Most e-cigarettes were not on the market as of February 15, 2007, and thus meet the TCA's definition of "new tobacco products," making it unlawful to market them without FDA authorization after the rule's August 2016 effective date. *See Wages*, 604 U.S. at 555. Initially, FDA announced that, for e-cigarettes already on the market as of the rule's effective date, the agency generally would not take enforcement action based on a product's lack of premarket authorization for a two-to-three-year period while manufacturers prepared, and FDA reviewed, marketing applications. 81 Fed. Reg. at 28,978. FDA extended that period until 2022,

8

but a court order then imposed, and FDA ultimately implemented, a September 2020 deadline for applications. *See Wages*, 604 U.S. at 555-56.

By late 2017, FDA began to see an alarming increase in the use of e-cigarettes by middle and high school students. *See Wages*, 604 U.S. at 554-55. In response, FDA increased enforcement actions against products marketed or sold to youth. *See* Appx.220, 235-38. In addition, the agency sent letters directing manufacturers with significant market share to submit plans to help restrict youth access to e-cigarettes. *See* Appx.223-24. Manufacturers proposed measures like age-verification technology for online sales, limits on the quantity of e-cigarettes that a customer may purchase within a particular period of time, contractual penalties for retailers that sell products to youth, and programs to monitor retailer compliance with age-verification and sales restrictions. *See* Appx.239.

Despite those efforts, in 2019, youth e-cigarette use hit the highest levels ever recorded, *see* Appx.225, leading FDA to revise its enforcement policy. Although FDA continued to enforce sales restrictions, it concluded that age verification and related measures are "not sufficient to address this issue, given the most recent data that youth use of [e-cigarette] products continues to increase." Appx.261. "The reality," FDA explained, "is that

9

youth have continued access to [e-cigarette] products in the face of legal prohibitions and even after voluntary actions by some manufacturers." Appx.261.

Instead of focusing solely on how products are sold, FDA's 2020 enforcement policy prioritized action with respect to the cartridge-based e-cigarettes with flavors (other than tobacco or menthol flavors) that were especially popular among youth at that time. *See* Appx.227. FDA emphasized the "extraordinary popularity" of flavored e-cigarettes among youth, Appx.230, noting that 93.2% of e-cigarette users aged 12-17 reported that their first e-cigarette was a flavored product, and that 71% of youth users indicated they used e-cigarettes "because they come in flavors I like," Appx.231 (quotation marks omitted).

Although the 2020 enforcement policy led to the removal of many flavored products from the market and contributed to a decline in youth use, e-cigarettes remain "the most commonly used type of tobacco product among youth," and "[t]he evidence shows that the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth." Appx.19. The market exit of flavored, cartridge-based e-cigarettes led to a substantial rise in youth use of

10

flavored, disposable e-cigarettes, illustrating that the removal of one flavored product option can prompt youth to migrate to other e-cigarette types that offer the desired flavor options, and "underscoring the fundamental role of flavor in driving appeal." Appx.21.

3. FDA has received and acted on a large number of applications to market e-cigarette products in various flavors. The agency has authorized the marketing of more than three dozen e-cigarette products, most of them tobacco flavored. *See* FDA, *E-Cigarettes Authorized by the FDA* (July 2025), https://perma.cc/S6GJ-NBJ3 (Tobacco Product Marketing Orders). FDA has determined that these products pose a comparatively low risk of enticing new users because "interest in tobacco flavor is low among youth." FDA, *Technical Project Lead (TPL) Review of PMTAs* 27 (May 12, 2022), https://perma.cc/A9BC-H6R3. At the same time, these products can benefit "established cigarette smokers," who have identified tobacco more often than other flavors as their "flavor of interest," and who could switch to e-cigarettes "as a way to reduce or stop smoking." *Id.* at 32.

In contrast, FDA has generally found that e-cigarettes with flavors other than tobacco present a significant risk to youth. *See supra* pp. 6-11; *Wages*, 604 U.S. at 562. To account for that heightened risk, in determining

11

whether a flavored e-cigarette product is appropriate for the protection of the public health, FDA has looked for evidence that such products provide a benefit to adult smokers beyond that provided by lower-risk tobacco-flavored e-cigarettes.  Applying that analysis case-by-case, FDA has granted marketing authorization for six menthol-flavored e-cigarettes for which the "evidence submitted by the applicant showed that these menthol-flavored products provided a benefit for adults who smoke cigarettes relative to that of the applicant's previously authorized tobacco-flavored products."  Press Release, FDA, *FDA Authorizes Marketing of Four Menthol-Flavored E-Cigarette Products After Extensive Scientific Review* (June 21, 2024), https://perma.cc/63WX-GFBF (NJOY Menthol E-Cigarette Press Release); *see also* Tobacco Product Marketing Orders; FDA, *FDA Authorizes Marketing of Tobacco- and Menthol-Flavored JUUL E-Cigarette Products* (July 17, 2025), https://perma.cc/7PDN-MYCM (JUUL Menthol E-cigarette Press Release).

### C.    Procedural History

In 2020, petitioner NicQuid submitted premarket tobacco product applications for e-liquids in flavors such as Southern Freeze (strawberry

peach), Spearmint, Menthol Blend, and Sweet Leaf. *See* Appx.37-38. All of these products include flavors other than tobacco flavoring.[1]

In May 2024, FDA issued a marketing denial order. *See* Appx.1-7. As directed by the Tobacco Control Act, FDA considered whether NicQuid had shown that the marketing of its flavored e-liquids would be "appropriate for the protection of the public health," taking into account both the "likelihood that those who do not use tobacco products will start using such products" and the "likelihood that existing users of tobacco products will stop." 21 U.S.C. § 387j(c)(2)(A), (4). FDA began by assessing the risk to youth. FDA explained that use of tobacco products "is almost always started and established during adolescence when the developing brain is most vulnerable to nicotine addiction." Appx.18. "Because of the lifelong implications of nicotine dependence that can be established in youth, preventing tobacco use initiation in young people is a central priority for protecting population health." Appx.18.

The available evidence showed that "flavored [e-cigarettes], including menthol," present "a known and substantial risk of youth

---

[1] Although petitioners describe Sweet Leaf as a tobacco-flavored product, the record does not support that assertion. *See infra* pp. 39-41.

13

initiation and use." Appx.16. FDA noted that the rate of youth e-cigarette use had declined from its peak in 2019, coinciding with increased enforcement efforts. Appx.16. But "[d]espite this decline, [e-cigarettes] have remained the most widely used tobacco product among youth, with youth use at high levels." Appx.16. And the agency explained that "[t]he evidence shows that the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth" and that "flavors not only facilitate initiation but also promote established regular [e-cigarette] use." Appx.19-20. "In 2022, 2.55 million youth reported current [e-cigarette] use with 84.9% of those using a flavored [e-cigarette] product." Appx.23.

FDA explained that flavoring makes products "more palatable for novice youth and young adults." Appx.20. And the evidence indicates that "non-tobacco flavors, including menthol, may influence the rewarding and reinforcing effects of flavored [e-cigarettes] … , thereby facilitating [e-cigarette] use and increasing abuse liability, thus increasing concerns of addiction in youth." Appx.20. Representative studies of behavior over time show that the use of flavored e-cigarettes, compared to tobacco-

14

flavored e-cigarettes, is "associated with progression … as well as escalation in the number of days [e-cigarettes] were used." Appx.20.

FDA considered "the impact of marketing restrictions and other mitigation efforts that aim to reduce the risk" to youth. Appx.29. Although such measures "are intended to curtail access to products," the agency's experience shows that "youth have been able to obtain products, including flavored [e-cigarettes], despite sales restrictions." Appx.31. FDA therefore concluded that traditional marketing and sales-access restrictions do not "mitigate the high risk to youth posed by flavored [e-cigarettes]." Appx.31. Upon reviewing NicQuid's marketing and access restriction plan, FDA found that the company proposed only traditional measures like "requiring age verification for online sales," "not using youthful-looking models," and "requiring business partners to establish an anonymous reporting hotline, report violations to the FDA, and use internal compliance checks." Appx.33. Because these restrictions did not include "any novel or materially different measures from those that FDA has previously considered and found insufficient" to curb youth use, FDA determined that these measures would not alter the agency's assessment of the products' risk to youth. Appx.33.

15

Having found that NicQuid's flavored e-cigarettes pose a significant risk to youth, FDA looked for evidence of a corresponding benefit, and it found that the applications "lack[ed] sufficient evidence demonstrating that [the] flavored [products] will provide a benefit to adult users that would be adequate to outweigh the risks to youth." Appx.34. In particular, FDA looked for evidence demonstrating that the new products are likely to help adult smokers completely transition from, or significantly reduce, their use of combustible cigarettes—the benefit that NicQuid claimed its products would provide, *see, e.g.*, Appx.353-56. But because tobacco-flavored e-cigarettes provide the same type of potential benefit but do not present the same risks to youth, Appx.353-56; Appx.26-27 n.xxv, FDA explained that an application to market flavored e-cigarette products must demonstrate an "added benefit" relative to tobacco-flavored products "that is adequate to outweigh the [comparatively greater] risks to youth," Appx.35.

FDA thus reviewed the applications "for evidence demonstrating that the new flavored products will provide an added benefit" to smokers relative to the benefit provided by tobacco-flavored products. Appx.34. The agency found no reliable evidence that showed such a benefit.

16

Appx.34-35.  The agency noted that the applications contained "cross-sectional surveys," but it determined that this evidence is insufficient to establish the claimed benefit because the surveys did not "evaluate the specific products in the application," "evaluate complete switching or significant cigarette reduction resulting from use of these products over time," or "evaluate these outcomes based on flavor type to enable comparisons between tobacco and other flavors."  Appx.35; *see* Appx.24-29.  Because NicQuid did not show that the potential benefits of its flavored products outweigh the substantial risk to youth, FDA denied the applications.  *See* Appx.1-7.

NicQuid and Wood Creek Vapory, a Texas-based retailer of NicQuid's products, timely petitioned for review.  This Court stayed FDA's marketing denial order in light of the en banc Court's then-controlling precedent in *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357 (5th Cir. 2024) (en banc).  Order (Aug. 8, 2024).  Petitioners opposed an abeyance pending the Supreme Court's review of *Wages* and elected to file their opening brief before the Supreme Court issued its decision in that case, relying heavily on this Court's since-vacated decision.  The Court then granted respondents' abeyance motion and, after *Wages* was decided,

17

granted petitioners leave to file a supplemental brief addressing the impact of FDA's amendment of the administrative record to include three additional items.  Order (Sep. 13, 2024); Order (Aug. 22, 2025).

## SUMMARY OF ARGUMENT

I.  FDA denied authorization to market NicQuid's flavored e-cigarette products based on largely the same analysis upheld in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025).  As in *Wages*, FDA determined that flavors create a significant risk of youth initiation and continued use, and that NicQuid had submitted insufficient evidence that the potential benefits of its flavored products outweigh their substantial risk.  Accordingly, FDA properly denied the applications because NicQuid had not shown that marketing the products would be "appropriate for the protection of the public health."  21 U.S.C. § 387j(c)(2)(A).

Petitioners' argument that FDA did not give appropriate weight to NicQuid's evidence of benefits to adult smokers is belied by the record, as is their argument that their products would pose less risk to youth than other flavored e-cigarettes.  At bottom, petitioners improperly ask this Court to second-guess the agency's reasonable scientific judgments.  The record also supports FDA's denial of authorization to market NicQuid's

18

zero-nicotine and Sweet Leaf products.  Petitioners now contend that NicQuid's zero-nicotine products do not meet the statutory definition for a tobacco product, but NicQuid had no need to apply for marketing authorization for the zero-nicotine products if that were so, and in its applications, NicQuid expressly stated that each product was a tobacco product under the statute.  FDA reasonably accepted those representations because even if a product does not itself contain nicotine, it remains a tobacco product if it is reasonably expected to be used with an e-liquid containing nicotine.  Petitioners' argument that the "Sweet Leaf" products are solely tobacco-flavored is likewise unavailing, as the administrative record reflects that FDA carefully considered the issue and exercised reasonable judgment in concluding that these products contain a "sweet" flavor in addition to tobacco.

II.  Echoing arguments that the Supreme Court unanimously rejected in *Wages*, petitioners also contend that FDA improperly changed positions regarding its approach to evaluating flavored e-cigarette applications. Petitioners partially abandoned this argument in light of the Supreme Court's decision, but that decision is equally fatal to petitioners' continued assertion that FDA unlawfully applied a "comparative-efficacy

19

requirement" when evaluating menthol-flavored e-cigarettes, as the Eighth Circuit has recognized. FDA's approach to deciding these applications flows directly from the statute, and FDA never created a menthol "safe harbor" of the sort that would trigger the change-in-position doctrine. Moreover, even if FDA's evolution in evaluating menthol products did constitute a "change" for purposes of this doctrine, FDA carefully explained the reasons for its approach and did not upset any legitimate reliance interests.

III. Petitioners also contend that FDA improperly applied a "comparative-efficacy" standard without notice-and-comment rulemaking, but as noted, FDA's implementation follows from the Tobacco Control Act, which "expressly contemplates comparisons of different tobacco products" in such adjudications. *Wages*, 604 U.S. at 578. Regardless, agencies may proceed by general rule or individual order. The Tobacco Control Act directs FDA to adjudicate marketing applications, and the Supreme Court has confirmed that FDA "had discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product applications," *id.* at 582. Petitioners' related argument that FDA impermissibly imposed a de facto ban on flavored e-cigarettes ignores that

20

FDA has in fact granted marketing authorization for certain menthol-flavored products.

IV. Even if this Court found any merit to petitioners' arguments, it should deny the petition for review as to NicQuid. The TCA does not allow NicQuid to petition for review in this Court because NicQuid does not have its principal place of business in the Fifth Circuit. And NicQuid cannot evade the TCA's venue provision by joining a retailer's petition.

## STANDARD OF REVIEW

The Court reviews FDA's denial of an application to market a new tobacco product under the Administrative Procedure Act (APA), *see* 21 U.S.C. § 387l(b), assessing whether the order is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). "The scope of this review 'is narrow,' and reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 567 (2025).

21

## ARGUMENT

I.    **FDA appropriately denied marketing authorization based on a lack of evidence that marketing NicQuid's products would be appropriate for the protection of the public health.**

A.    **The record amply supports FDA's determination.**

1. NicQuid sought marketing authorization for flavored e-cigarettes based on evidence substantially similar to that presented in *FDA v. Wages & White Lion Investments, LLC*, 604 U.S. 542 (2025). And, as with the manufacturers in *Wages*, NicQuid failed to submit sufficient evidence to demonstrate that its products are appropriate for the protection of the public health. *Wages* affirmed the validity of FDA's method of considering such applications, and there is no reason for the Court to reach a different conclusion here.

Under the TCA, FDA "shall deny" an application to market a new tobacco product unless the applicant shows that marketing the product would be "appropriate for the protection of the public health." 21 U.S.C. § 387j(c)(2)(A). In making that assessment, FDA evaluates "the risks and benefits to the population as a whole," taking into account both the "likelihood that those who do not use tobacco products will start using

22

such products" and the "likelihood that existing users of tobacco products will stop." *Id.* § 387j(c)(4).

FDA's review of NicQuid's applications showed that "for flavored [e-cigarette products], including menthol, there is a known and substantial risk of youth initiation and use." Appx.16. FDA found that e-cigarettes "have remained the most widely used tobacco product among youth, with youth use at high levels." Appx.16. "In 2022, 2.55 million youth reported current [e-cigarette] use with 84.9% of those using a flavored [e-cigarette] product." Appx.23; *see* Appx.19. And the evidence showed that "the availability of a broad range of flavors is one of the primary reasons for the popularity of [e-cigarettes] among youth." Appx.19. These "non-tobacco flavors, including menthol, may influence the rewarding and reinforcing effects of flavored [e-cigarettes] … thereby facilitating [e-cigarette] use and increasing abuse liability" and "concerns of addiction." Appx.20.

Given that substantial risk to youth, FDA looked for reliable evidence that NicQuid's flavored products would provide a greater benefit than lower-risk tobacco-flavored products in leading existing smokers to completely switch from combustible cigarettes or significantly reduce their

23

use.  As the Supreme Court made clear, the statute "expressly contemplates [such] comparisons of different tobacco products." *Wages*, <mark>604 U.S. at 578</mark>.

But NicQuid did not provide adequate evidence in its applications: It had no "randomized controlled trial[s]" or "longitudinal cohort stud[ies]" that examined "the benefit to adult[]" users of its flavored products compared to that of lower-risk tobacco-flavored products.  Appx.34-35. And the "other evidence" NicQuid pointed to was "not adequate" to support a finding that NicQuid's products have "a sufficiently robust benefit to adults … that could outweigh the risk to youth and show a net population health benefit."  Appx.13-14.  The applications contained "cross-sectional surveys," but FDA found this evidence insufficient because the surveys did not "evaluate the specific products in the applications," "evaluate complete switching or significant cigarette reduction resulting from use of these products over time," or "evaluate these outcomes based on flavor type to enable comparisons between tobacco and other flavors." Appx.35; *see* Appx.24-29.  Moreover, FDA found that this evidence was inadequate to evaluate product switching or cigarette reduction "over time," because such consumer surveys "entail a one-time assessment of self-reported outcomes."  Appx.27-28.  Overall, FDA concluded that

NicQuid's evidence did not demonstrate that the benefit of its products outweighs their risk, and FDA therefore appropriately issued a marketing denial order.

2. Petitioners' contentions (Pet.Br.37-42) that FDA's analysis was arbitrary and capricious are meritless. These arguments are unsupported by the record and fail to acknowledge the agency's "broad discretion to decide what sort of scientific evidence" is sufficient. *Wages*, 604 U.S. at 571; *see id.* at 567 (reiterating that "reviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency").

a. Petitioners do not dispute the extent of underage use of e-cigarettes generally or the extent to which flavored products drive their popularity. But petitioners nonetheless contend that FDA erred in concluding that NicQuid's flavored products would pose a serious risk to youth.

Specifically, petitioners assert that NicQuid's "open-system[]" products pose less risk to youth than "closed-system" products because surveys indicate that minors have historically been more likely to use

25

closed-system products.  Pet.Br.39.[2]  As the Supreme Court said, this argument is "not persuasive." *Wages*, 604 U.S. at 586.  *Wages* explained that "[e]ven though the FDA did not cite evidence that was specifically about increasing youth demand for open-system e-cigarette products," it "drew a reasonable inference based on the data before it: namely, that the rapid shift in youth demand from flavored cartridge-based products to flavored disposable products strongly suggested that youth were most strongly drawn by flavor rather than device type." *Id.*; *see* Appx.21 (explaining that, "as certain product types become harder to obtain, consumers, including youth, may switch to less popular products that are more readily attainable").  The Supreme Court saw "no reason why the FDA could not extrapolate from that data and conclude that young people would be drawn to flavored products for open-system e-cigarettes." *Wages*, 604 U.S. at 927.  Just as in *Wages*, none of petitioners' evidence is "of sufficient heft

---

[2] Closed-system e-cigarettes either contain a set amount of e-liquid and are designed to be discarded when the e-liquid runs out, or they are designed to use replaceable pods or cartridges that come pre-filled with e-liquid.  *See Wages*, 604 U.S. at 554.  An open-system e-cigarette, by contrast, "contains a 'tank' that users can manually refill with the desired amount of e-liquid." *Id.*  "Users of open-system products" like NicQuid's "may mix their own e-liquids and adjust the amount of e-liquid in the tank." *Id.*

to call into question whether the FDA's factual determinations about the powerful effect of flavor is supported by substantial evidence in the existing administrative record." *Id.* at 586 (quotation marks omitted). Moreover, just as in *Wages*, the data that petitioners rely on (Pet.Br.39) postdates the filing of their applications and is not in the administrative record. Petitioners here, as in *Wages*, thus err in relying on this data. *See Wages*, 604 U.S. at 586; *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

Petitioners' related assertions regarding NicQuid's proposed marketing and access restrictions are likewise unavailing. In petitioners' telling, NicQuid's products have not previously been especially popular among youth, which petitioners take to indicate that "NicQuid's restrictions" on marketing and access "have worked" in mitigating the risk to youth. Pet.Br.38. That is wrong on multiple levels. The premise of petitioners' argument is faulty because the data do not establish that NicQuid's products have historically been unpopular among youth. For example, it is unsurprising that NicQuid's sales data do not include

27

purchasers whom NicQuid knows to be under the legal age to purchase its products. *See* Appx.352. As FDA explained, "the majority of youth do not purchase e-cigarettes themselves from retail locations, but rather they obtain them from social sources, including from friends or family members, steal them, or use someone else's product," Appx.31, and thus petitioners' data on the age of purchasers does not directly address the likelihood of consumption by underage youth. Petitioners also assert that FDA "turned a blind eye to" survey results in which none of the high-school or middle-school respondents "reported having used a NicQuid product." Pet.Br.38. But the data that petitioners rely on postdate the filing of their applications, are not in the administrative record, and in any event are far less informative than NicQuid suggests because many youth either do not know what brand they use or use brands that are not listed on these surveys. *See, e.g.*, Jan Birdsey et al., *Tobacco Product Use Among U.S. Middle and High School Students — National Youth Tobacco Survey, 2023*, 72 Morbidity & Mortality Wkly. Rep. 1173, 1180 tbl. 3 (2023) (reflecting that more than 40% of respondents to the 2023 survey referenced in NicQuid's brief stated that they either did not know what brand they used or used a brand that was not listed on the survey).

28

Moreover, even if the record supported petitioners' assertion that these products have not historically been popular among youth, FDA reasonably concluded that NicQuid's marketing and access restrictions would not prevent future youth use: As FDA has explained, the "popularity of certain styles is likely dynamic and affected by the marketplace," but "the role of flavor is consistent." Appx.21. FDA thus reasonably concluded that NicQuid's flavored e-cigarettes present a significant risk to youth going forward, even if they were not widely used by youth in the past, because youth can be expected to turn to NicQuid's products if other flavored products are unavailable. Furthermore, FDA considered NicQuid's proposed marketing and access measures—none of which was "novel or materially different … from those that FDA has previously considered and found insufficient"—and determined that they were insufficient "to mitigate the substantial risk to youth from flavored [e-cigarettes]." Appx.33. Petitioners do not even argue that FDA's evaluation of the access and marketing plans at issue here was arbitrary and capricious. *See, e.g., SWT Glob. Supply, Inc. v. FDA*, 139 F.4th 957, 964 (8th Cir. 2025) (post-*Wages* decision rejecting such a challenge).

29

b. Given that the evidence indicated that NicQuid's flavored products would pose substantially more risk to youth than tobacco-flavored products, NicQuid bore the burden of demonstrating that its products provided sufficient countervailing benefits to adult users. In asserting that NicQuid made such a showing, petitioners contend that FDA's Technical Project Lead (TPL) Review "never weighed the results of NicQuid's March 2020 consumer use survey." Pet.Br.40. But the TPL in fact reflects that FDA exercised its scientific judgment to conclude that none of the "cross-sectional surveys" NicQuid relied on provided "sufficiently strong" evidence to show that the benefits of its products outweigh the risks. Appx.33-34. The administrative record confirms that FDA considered each of the surveys NicQuid submitted, including "a cross-sectional survey specific to NicQuid" that relied on a sample size of "121 customers" — apparently the 2020 consumer-use survey that petitioners refer to. Appx.50, 57; *see* Appx.323-27 (portions of NicQuid's survey relied upon in petitioners' brief). FDA determined that this survey was "not product specific," Appx.50 — rather, it encompassed a range of flavors and nicotine concentrations without differentiation. FDA explained that such studies are inadequate to demonstrate a potential public-health

30

benefit because a "specific product's ability to provide adequate reinforcement and continue to satisfy a smoker's cravings over time, which is a function of the design of the specific product itself, are critical factors in determining likelihood of continued use and the product's ability to promote switching."  Appx.26 n.xxiii.  FDA further determined that NicQuid's "studies do not assess the effects of complete switching or cigarette reduction over time" or permit FDA "to compare the effects of the new flavored products vs. tobacco-flavored [e-cigarette] products."  Appx.50; *see* Appx.33-34 (similar reasoning in the TPL).

Moreover, NicQuid's survey results are hardly compelling on their own terms, let alone sufficiently robust to warrant overturning FDA's scientific judgment.  Petitioners note (Pet.Br.19) that the survey of 121 of NicQuid's own customers indicated that NicQuid's menthol- and mint-flavored e-cigarettes are more popular than tobacco-flavored e-cigarettes.  *See* Appx.327.  But as FDA explained, this observation says nothing about their ability to help smokers switch away from (or significantly reduce their use of) combustible cigarettes.  That is because, if smokers were just as likely to use tobacco-flavored e-cigarettes if the flavored e-cigarettes were unavailable, then marketing the higher-risk flavored products is not

31

appropriate for the protection of the public health. Appx.33-35; *see* Appx.24-29. Petitioners also note (Pet.Br.19) that approximately 40% of the survey respondents reported using some type of e-cigarette to reduce their use of combustible cigarettes. *See* Appx.326. This statistic is at best underwhelming because it establishes that the majority of respondents did not use e-cigarettes to reduce use of combustible cigarettes. In any event, the survey is based on evidence that does not relate to the specific products at issue. Appx.33-34.

There is likewise no merit to petitioners' contention that FDA did not adequately address evidence that NicQuid's products expose users to fewer "Harmful and Potentially Harmful Constituents" than combustible cigarettes. Pet.Br.40-41. FDA has repeatedly acknowledged that e-cigarettes can potentially benefit those who switch from combustible cigarettes for exactly this reason. *See, e.g.*, Appx.24. The problem is that the reduction of harm offered by such products can be realized only if smokers of combustible cigarettes actually switch to the e-cigarettes at issue or significantly reduce their use of combustible cigarettes, and NicQuid's evidence fell short of making that showing.

3. Petitioners also take issue with FDA's determination to "conduct[] a 'targeted review'" that focused on whether NicQuid had provided sufficient evidence of benefits to adults to outweigh the well-established risk to youth from flavored e-cigarettes. Pet.Br.34-37. To the extent this argument just repackages petitioners' arbitrary-and-capricious challenge, *see* Pet.Br.37 (arguing that FDA failed to "consider all of the [premarket tobacco application]'s contents"), petitioners failed to identify anything in their applications that FDA failed to accord adequate weight to for the reasons discussed above.

Petitioners also gesture toward an additional argument in the same arbitrary-and-capricious vein—that FDA should not have focused on "the relative cessation benefits to adult smokers" for NicQuid's products without also analyzing "all other *risks and benefits* of a given product," Pet.Br.35—but petitioners fail to identify credible evidence in the record regarding benefits outweighing risks, let alone demonstrate that FDA erroneously failed to consider the evidence. The dearth of such evidence is unsurprising since NicQuid's applications themselves identified adult smokers and youth as the two populations most directly affected by the

products.  *See, e.g.*, Appx.353-55 (addressing the products' potential impacts on adult smoking cessation and youth initiation of nicotine).

Petitioners fare no better in asserting that FDA's decision here is inconsistent with the "plain language" of the TCA.  Pet.Br.35.  When FDA determines that an application has a dispositive deficiency in one regard that would not be overcome regardless of what evidence the applicant may have amassed as to distinct issues, nothing in the TCA (or common sense) dictates that the agency must nonetheless expend limited resources analyzing evidence that is not relevant to the dispositive issue and therefore could not affect the agency's conclusion.  That the TCA "defines" what is appropriate for the protection of the public health "in broad terms," Pet.Br.35, only underscores that the statute "left the agency broad discretion to decide what sort of scientific evidence an applicant was required to submit," *Wages*, 604 U.S. at 571.  Petitioners invoke *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), but *Loper Bright* did not displace longstanding rules regarding deference to agency scientific determinations. *Id.* at 392 (explaining that the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential"); *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 182 (2025) (reiterating that

34

a court must be at its "most deferential" for "scientific judgments" (quotation marks omitted)). The issues here implicate FDA's scientific judgments regarding the risks and benefits of NicQuid's products, and the Supreme Court has confirmed that such judgments are entitled to deference. *Wages*, 604 U.S. at 567.

**B.    FDA did not err in denying authorization to market NicQuid's zero-nicotine and Sweet Leaf products.**

1. FDA properly denied all of NicQuid's applications for flavored e-liquids, including for five e-liquids not containing nicotine. The TCA generally requires an applicant to receive authorization from FDA before marketing any "new tobacco product," 21 U.S.C. § 387j(a)(2), and the statute defines "tobacco product" as "any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product," *id.* § 321(rr)(1). In its applications, NicQuid expressly sought an order authorizing the marketing of several zero-nicotine products—authorization that would not have been required if those products were not tobacco products. *See, e.g.*, Appx.271, 275 ("NicQuid LLC[] is seeking market orders under section 910(c)(1)(A)(i) of the FDCA for its NicQuid

35

branded E-Liquid" products listed in the application, the first of which has a "Nicotine Concentration" of "00mg/ml"). Moreover, NicQuid represented that each product in its applications—including the zero-nicotine products—is "an e-liquid that contains tobacco-derived nicotine and is intended for use in open-system (refillable) electronic nicotine delivery systems." Appx.270. NicQuid further represented that each of the products for which it sought authorization "meets the definition of a tobacco product as set forth in [§ 321(rr)(1)]." Appx.270.[3] These representations are flatly at odds with petitioners' assertion here—which finds no support in the one page of the record petitioners rely on, *see* Appx.319—that their applications "included" zero-nicotine products merely to illustrate "one extreme of nicotine concentration that was tested for [Harmful and Potentially Harmful Constituents]." Pet.Br.21, 45-46.

---

[3] *See also* Appx.276-78; Appx.279-80, 284; Appx.285-86, 291; Appx.292-93, 298. NicQuid made similar representations when seeking authorization to market a zero-nicotine version of its Sweet Leaf product, Appx.299-300, 304, but NicQuid does not appear to dispute that this product is a "tobacco product," presumably because this assertedly tobacco-flavored liquid is "made or derived from tobacco," 21 U.S.C. § 321(rr)(1). Pet.Br.45 ("Five of NicQuid's products listed in the [marketing denial order] have zero-nicotine options *and* are not made or derived from tobacco." (emphasis added)).

Having submitted the zero-nicotine products for authorization and having stated that they meet the definition of a tobacco product, petitioners cannot now claim that FDA's treatment of the products was arbitrary and capricious. Petitioners' newly minted argument cannot be squared with the "general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952); *see, e.g., BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 828 (5th Cir. 2003) ("Generally, in considering a petition for review from a final agency order, this court will not consider questions of law which were neither presented to nor passed on by the agency."). Petitioners' "obvious about-face render[s]" their argument on this issue plainly "forfeited." *Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 895 F.3d 90, 96 (D.C. Cir. 2018); *cf. Munoz v. State Farm Lloyds of Tex.*, 522 F.3d 568, 573 (5th Cir. 2008) ("The invited error doctrine provides that a party may not complain on appeal of errors that he himself invited or provoked the court to commit." (alteration and quotation marks omitted)).

37

Regardless, FDA did not err when it accepted NicQuid's representation that its zero-nicotine products are tobacco products under the statute.  As petitioners acknowledge (Pet.Br.45), the statutory definition of "tobacco product" includes "any component, part, or accessory of a tobacco product," 21 U.S.C. § 321(rr)(1).  FDA has consistently and reasonably explained that "nicotine-free e-liquid that is intended or reasonably expected to be used with or for the human consumption of tobacco products in most cases would be a component or part of a tobacco product and, therefore, within the scope" of the TCA.  81 Fed. Reg. at 29,032; *see also* 21 C.F.R. § 1140.3 (defining "component or part" of a tobacco product as including "materials intended or reasonably expected … [t]o be used with or for the human consumption of a tobacco product").  For example, if a zero-nicotine e-liquid "is intended or reasonably expected to be mixed with liquid nicotine, that e-liquid may be a component or part of a tobacco product."  Appx.90.

Petitioners err in arguing that NicQuid's zero-nicotine products must not be intended to be mixed with nicotine because "[a] consumer wishing to use these flavors with nicotine would simply purchase one of NicQuid's nicotine options."  Pet.Br.46.  As an initial matter, NicQuid failed to make

this argument before FDA.  In any event, the argument is unavailing because consumers might buy a zero-nicotine product because they wish to mix and match it with other flavors, along with an unflavored nicotine product, to their desired taste, or because they want to more precisely control the amount of nicotine they add to the flavored e-liquid.  Given NicQuid's representations in its applications, FDA reasonably concluded that the zero-nicotine products at issue here were reasonably expected to be used for this purpose.

2.  Petitioners likewise fail (Pet.Br.46-47) to show any reversible error in FDA's conclusion that NicQuid's Sweet Leaf products are not solely tobacco-flavored and thus present a heightened risk of youth use.  Petitioners assert that "FDA did not bother to review the entire application," Pet.Br.46, but they fail to even cite FDA's analysis of this exact issue in the administrative record, let alone explain in what respect that analysis could properly be disturbed by this Court.  As FDA's "Regulatory Review for Identification of Characterizing Flavor" explains, the agency "conducted a review of the totality of circumstances for each product" to determine "an appropriate flavor category": tobacco only (without the addition of any other flavors), menthol-flavored, other-flavored, or

39

unflavored.  Appx.62.  To conduct that analysis, FDA "examine[d] information from the product name, labels, labeling, [characterizing flavor] noted on the cover page, [characterizing flavor] on FDA Form 4057b[,] … [characterizing flavor] listed in the product information description sheet, and [characterizing flavor] listed in the environmental assessment." Appx.62.

For NicQuid's Sweet Leaf products, FDA recognized that some of the sources it looks to, such as the flavor NicQuid self-reported in the cover letter to its application, "impl[y] a tobacco [characterizing flavor]." Appx.66; *see* Appx.300-03.  But the agency found that the product name and label each "impl[y]" that the products are "flavored" with more than just tobacco "due to the term 'Sweet'"—a term suggesting a sweet flavor in addition to traditional tobacco flavoring.  Appx.66; *see also* NicQuid, *Sweet Leaf*, https://perma.cc/TJ64-JTTQ (describing Sweet Leaf as "[a] sweet turn on your favorite bold tobacco flavor"—a "flavor" that "will excite your taste buds" due to its "undertone of sweet and spice").  FDA also explained that several potential indicia of flavor are "ambiguous," including many words on the label—"Leaf," "Flavored E-Liquid," and "Blend Collection"—as well as the "[i]ngredient listing" for the product.  Appx.66.

40

On balance, FDA concluded "[b]ased on the totality of the information" that the products "are flavored" with more than just tobacco. Appx.66.

NicQuid has failed to establish that it was entitled to have its Sweet Leaf products evaluated instead as if their characterizing flavor were solely tobacco. FDA made a "'factual determination[]'" to the contrary, so this Court's role is limited to determining whether FDA's finding "is supported by 'substantial evidence' in the 'existing administrative record.'" *Wages*, 604 U.S. at 586 (quoting *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019)). This "threshold" for "evidentiary sufficiency is not high," and it is readily satisfied on the record here. *See Biestek*, 587 U.S. at 102-03 (explaining that "substantial evidence" is a "term of art" that "means — and means only — such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" (quotation marks omitted)).

## II. Petitioners' change-in-position arguments cannot be squared with the Supreme Court's decision in *Wages*.

A. In their opening brief, petitioners relied on this Court's then-"controlling" decision in *Wages* to argue that FDA "failed to give manufacturers of non-tobacco flavored [e-cigarettes], including menthol products, fair notice of the grounds underlying the [marketing denial

orders for e-cigarette products], including the comparative efficacy test requirement." Pet.Br.31-34. But the Supreme Court's decision in *Wages* is now the controlling precedent, and that decision dooms petitioners' arguments.

In *Wages*, the Supreme Court unanimously rejected the argument that FDA had unlawfully "chang[ed] the requirements for premarket tobacco product applications between the time of its guidance and the denials of respondents' applications." 604 U.S. at 566. There, as here, the manufacturer argued that FDA changed positions on what "kinds of [scientific] studies" would be required, on the "comparative-efficacy requirement" under which manufacturers would need to "compare the health effects" of their non-tobacco-flavored products "to those of tobacco-flavored products," and on the relevance of "device type." *Id.* at 571-86; *see* Pet.Br.31-32 (scientific-evidence argument); Pet.Br.32 (comparative-efficacy argument); Pet.Br.32-33 (device-type argument). The Supreme Court squarely rejected each of these contentions: "[I]n the end, we cannot say that the FDA improperly changed its position with respect to scientific evidence, comparative efficacy, or device type." 604 U.S. at 566-67.

42

Petitioners partially abandoned their change-in-position arguments in light of the Supreme Court's decision, but they still cling to the assertion that FDA unlawfully applied a "comparative-efficacy requirement" to their menthol products. Suppl.Br.3 n.3, 3-6; *see also* RJRV.Amicus.Br.20-27. As the Eighth Circuit has recognized, however, "*Wages* is decisive on this point despite the fact that it did not concern menthol-flavored [e-cigarette] products." *SWT Glob.*, 139 F.4th at 963; *see also Logic Tech. Dev. LLC v. FDA*, 84 F.4th 537 (3d Cir. 2023), *cert. denied*, 145 S. Ct. 1921 (2025) (rejecting similar arguments pre-*Wages*).

The Supreme Court explained in *Wages* that "[t]he change-in-position doctrine asks two questions." 604 U.S. at 569. "The first is whether an agency changed existing policy," which occurs "when an agency acts inconsistently with an earlier position, performs a reversal of its former views as to the proper course, or disavows prior inconsistent agency action as no longer good law." *Id.* at 569-70 (citations, alterations, and quotation marks omitted). If a change in agency position is identified, "the doctrine poses a second question: Did the agency 'display awareness that it *is* changing position' and offer 'good reasons for the new policy'?" *Id.* at 570 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

43

An agency "does not need to show that the reasons for the new policy are *better* than the reasons for the old one" or "provide a more detailed justification than what would suffice for a new policy created on a blank slate," but "the agency must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (quotation marks omitted). The Supreme Court's case law has set a "high[] bar" to establish a change-in-position claim, requiring, for example, "decades of industry reliance on an agency's prior policy.'" *Id.* at 585 (alteration and quotation marks omitted).

Like the manufacturers in *Wages*, petitioners' argument distills to the assertion that "FDA initially gave applicants broad discretion to select appropriate comparators for their products" but then improperly analyzed NicQuid's menthol-flavored products with a focus on whether they "promote more switching" away from combustible cigarettes compared to tobacco-flavored e-cigarettes. 604 U.S. at 578-79 (quotation marks omitted). But that argument fails under *Wages*. "[T]he TCA expressly contemplates comparisons of different tobacco products," and it calls upon the FDA to make "an inherently comparative judgment." *Id.* at 578 (citing 21 U.S.C. § 387j(b)(1)(a), (c)(4)). FDA's "predecisional guidance" simply "elaborated

44

on the types of comparisons that would be helpful." *Id.* at 579 (discussing a June 2019 guidance document); *see* Appx.81-141.[4] The guidance "underlined the FDA's concern about the potential impact of flavors on product toxicity and appeal to youth and young adults." *Wages*, 604 U.S. at 579 (quotation marks omitted); *see also* Appx.128. FDA's subsequent decision to look for data comparing the efficacy of NicQuid's menthol-flavored products and tobacco-flavored products in promoting switching or smoking cessation was thus a "predictable outgrowth from previous guidance." *Wages*, 604 U.S. at 581.

Petitioners therefore have not established that FDA "act[ed] inconsistently with an earlier position, perform[ed] a reversal of its former views …, or disavow[ed] prior inconsistent agency action." *Wages*, 604 U.S. at 569-70 (citations, alterations, and quotation marks omitted). Here, as in *Wages*, "FDA did not contradict any previously announced position with respect to the comparative effects of differently flavored products" when it reviewed NicQuid's applications and determined that there was

---

[4] This guidance document was originally issued in 2019, and updated in 2023 to the version that is included in the administrative record. *See* Appx.81-141. The documents do not differ in any material respect. *See* Appx.141 (summarizing the 2023 updates).

45

insufficient evidence of benefits to outweigh the risks to youth. *Id.* at 580; *see* Pet.Br.8-10 (discussing predecisional guidance from 2019); *see also SWT Glob.*, 139 F.4th at 963 ("Just as with other [e-cigarette] products, the agency did not articulate firm requirements regarding how it would treat menthol-flavored [e-cigarette] products before issuing its [marketing-application] denials, so it never changed position.").

Moreover, as in *Wages*, NicQuid "received the FDA's message" regarding the types of evidence it should include in its applications—its applications contain "statements attempting (albeit unsuccessfully) to draw comparisons" between their menthol-flavored products "and tobacco-flavored products—the same sort of comparisons for which the FDA allegedly provided no notice." *Wages*, 604 U.S. at 581-82; *see, e.g.*, Appx.358-59 (relying on "consumer survey results" of NicQuid customers indicating that "only 19% of respondents chose Tobacco" when asked what flavor they preferred in contrast to the 60.3% who stated they preferred "Mint or Menthol"); Appx.357 (relying on additional surveys to support similar points); *see also* Pet.Br.19 (similar).

B.  Notwithstanding all this, petitioners and amici seize on FDA's 2020 enforcement guidance, which "telegraphed its view that dessert-,

candy-, and fruit-flavored e-cigarette products are more likely than tobacco- and menthol-flavored products to appeal to the young." *Wages,* 604 U.S. at 580; *see* Appx.235-38. But that document described FDA's priorities for enforcement—explaining that FDA intended to prioritize other flavors over tobacco and menthol flavors at that time—and said nothing about the comparisons manufacturers would be expected to make in their applications to market new tobacco products. *See* Appx.219 ("This guidance document describes how we intend to prioritize our enforcement resources with regard to the marketing of certain deemed tobacco products that do not have premarket authorization."). Any inferences from the enforcement guidance that NicQuid drew for its marketing applications were thus unfounded.

FDA "never suggested it would automatically grant [applications] for menthol-flavored [e-cigarette] products." *SWT Glob.,* 139 F.4th at 963. To the contrary, FDA's enforcement guidance included a "warning that the agency would *also* prioritize enforcement against manufacturers 'whose [products'] marketing is likely to promote use by … minors.'" *Wages,* 604 U.S. at 583 (alterations in original) (quoting 2020 Enforcement Guidance, *see* Appx.220). The TCA vests FDA with the responsibility to exercise its

47

scientific judgment to continually assess whether there is a net public health benefit, when taking into account the known risks a given new tobacco product would pose to youth, and that is exactly what FDA did when it conducted a focused analysis on menthol and evaluated NicQuid's applications in light of that analysis.

Petitioners also reference a 2021 document providing a sample of the type of analysis that FDA conducted for flavored e-cigarettes other than menthol. The document notes that "[a]pplications for menthol-flavored [e-cigarettes] will be addressed separately" because "the assessment for menthol [e-cigarettes], as compared to other non-tobacco-flavored [products], raises unique considerations." Appx.305 n.ii. But saying that menthol-flavored products raise unique considerations and will be addressed separately is not an assurance that menthol-flavored products would, after further review, in fact be treated differently or would not be subject to a similar analysis. In any event, the 2021 document that petitioners cite was released after NicQuid submitted its applications, so it could not possibly have engendered any reliance interests.

Petitioners and amici assert that two memoranda from 2022 reflect "a complete about-face" on menthol. Suppl.Br.4-5; RJRV.Amicus.Br.22-23; *see*

48

Appx.142-49 (memoranda). But the reality is far more nuanced. *See Logic Tech.*, 84 F.4th at 550-53 (rejecting an accounting of these memoranda that "both oversimplifies and obscures"). These internal memoranda trace FDA's "process and analytical framework" for evaluating applications for menthol-flavored e-cigarettes, describing such applications as raising "questions of first impression" that "involve[] novel and complex questions that overlap matters of science, law, and policy." Appx.142; *see also* Appx.147. The substance of the documents highlights the thoroughness of FDA's process and its consideration of countervailing evidence and views before reaching a conclusion regarding the appropriate analytical framework for menthol-flavored products like NicQuid's.

FDA's careful consideration of how to evaluate applications for menthol-flavored e-cigarettes did not violate the change-in-position doctrine. Instead, FDA's position regarding menthol flavoring over time is similar to not only the "comparative-efficacy" issue resolved in *Wages* (Part III.B.2 of the Supreme Court's opinion) but also the device-type issue (Part III.B.3). As with non-cartridge products, FDA "did not establish 'a safe harbor'" for menthol-flavored products. 604 U.S. at 584. As in that context, FDA's analysis is not a "change" for purposes of the "change-in-position

49

doctrine" because "there was no new ground to break" given that these denial orders "were part of the FDA's first major exercise of its new authority over tobacco products under the TCA." *Id.* at 584.

Furthermore, petitioners' arguments based on the 2022 memoranda are a mismatch for the change-in-position doctrine, which responds to the concern that "an agency should not mislead regulated entities." *Wages*, 604 U.S. at 567. The 2022 memoranda reflect that there was internal debate and discussion at FDA about how to apply the statutory criteria to applications for menthol-flavored products; but because those discussions were internal, they could not possibly form the basis for "mislead[ing]" manufacturers or "engender[ing]" any "reliance interests" that might be relevant here. *Id.* at 567-69 (quotation marks omitted). Petitioners have not identified any *public* position that FDA later reversed, and they certainly have not identified any such position in a "formal setting" as is required to demonstrate an unlawful change in position. *See id.* at 569 n.5 (explaining that the Court has "traditionally applied the change-in-position doctrine when an agency shifts from a position expressed in a more formal setting" than a "nonbinding guidance document").

50

Moreover, "[e]ven if the FDA had changed its position, it offered good reasons," *Wages*, 604 U.S. at 584 (quotation marks omitted): here, that "adopt[ing] the approach applied to other non-tobacco-flavored [e-cigarettes]" was appropriate because a careful internal agency deliberation process led to an ultimate determination that, in FDA's scientific judgment, menthol flavors "present a similar risk to youth" and "the literature did not demonstrate that menthol-flavored [e-cigarettes] were differentially effective, relative to tobacco-flavored [e-cigarettes], in terms of promoting significant cigarette reduction or complete switching among adult smokers." Appx.149; *see also* Appx.147-48; Appx.17 (TPL Review here). FDA further explained that its position was supported by new data from a 2022 survey that allowed FDA to "differentiate youth use of mint and menthol flavors separately" where it had not previously been able to do so, and the new data showed that "menthol-flavored [e-cigarettes] were used by 26.6% of middle- and high-school users of flavored [e-cigarettes], which is similar to the use rates for" other flavors. Appx.16 n.ix.

What is more, petitioners also "cannot claim that the FDA's revised" approach to menthol flavor "upset a legitimate reliance interest": "At most, the 2020 guidance may have led [NicQuid] to *believe* that the FDA was

51

more likely to authorize [its menthol-flavored] products," but this "is not a serious reliance interest" under governing precedent. *Wages*, <mark>604 U.S. at 585</mark> (alteration and quotation marks omitted). Like the manufacturers in *Wages*, NicQuid was "part of the very first wave of marketing denials under the FDA's newly minted jurisdiction over tobacco products," so it "could not have built up decades of reliance" of the sort that allows for a viable claim under the "high[] bar" set by the Supreme Court's "change-in-position cases." *Id.; see also SWT Glob.*, <mark>139 F.4th at 962-63</mark> (upholding FDA's approach for menthol-flavored e-cigarettes over similar challenges); *Logic Tech.* <mark>84 F.4th at 548-54</mark> (similar).[5]

## III.   FDA did not violate any procedural requirements by conducting a comparative analysis.

There is likewise no merit to petitioners' contention that FDA violated the Tobacco Control Act by not engaging in notice-and-comment rulemaking before reviewing NicQuid's applications for evidence that the company's flavored products provide "an added benefit to adult smokers

---

[5] The change-in-position analysis from *R.J. Reynolds Vapor Co. v. FDA*, <mark>65 F.4th 182, 192-93</mark> (5th Cir. 2023), has been abrogated by *Wages*. Petitioners and their amici thus err in relying on *R.J. Reynolds*. *See* Pet.Br.31-34; Suppl.Br.9; RJRV.Amicus.Br.20-25.

relative to tobacco-flavored products," Appx.34—which the Supreme Court referred to in *Wages* as a "comparative-efficacy requirement," 604 U.S. at 578. *See* Pet.Br.42-45; Suppl.Br.6-8; RJRV.Amicus.Br.5-20. This approach follows from the statute and the agency's assessment of the risks, and in any event, it is perfectly permissible for FDA to develop its approach through adjudication.

A. As an initial matter, the analysis that FDA applied to its review of NicQuid's products (referred to by petitioners as the "comparative-efficacy requirement") is not a new standard devised by FDA; rather, it flows from the Tobacco Control Act. As the Supreme Court explained, the Act "expressly contemplates comparisons of different tobacco products." *Wages*, 604 U.S. at 578. It requires an applicant to provide information concerning "'whether [its] tobacco product *presents less risk than other tobacco products*." *Id.* (alteration in original) (quoting 21 U.S.C. § 387j(b)(1)(A)). And "FDA's determination that a new tobacco product is 'appropriate for the protection of the public health' is an inherently comparative judgment." *Id.* By requiring FDA to account for the "increased or decreased likelihood" that existing tobacco users will stop using such products and that new users will start using such products, 21

U.S.C. § 387j(c)(4), the TCA "calls out for various types of comparisons, including comparisons between new tobacco products and those that are already available, as well as between different types of new tobacco products that may attract new smokers," *Wages*, 604 U.S. at 579.

Rather than enacting a regulatory standard, FDA applied the statutory criteria to NicQuid's applications. FDA canvassed the scientific evidence as to the risks of tobacco products. *See* Appx.15-24. It then made relevant comparisons, including between NicQuid's flavored products and tobacco-flavored e-cigarette products that are already on the market. FDA explained that the evidence showed that "tobacco-flavored [e-cigarettes] have not been shown to present the same risks to youth as flavored [e-cigarettes]." Appx.26; *see* Appx.26 n.xxv. And FDA reasoned that whether tobacco-flavored products "give adults who smoke comparable options for complete switching … bears on the extent of the public health benefit that [NicQuid's flavored products] may provide to that population." Appx.27. Accordingly, FDA examined "the degree of benefit" of NicQuid's flavored products "over a tobacco-flavored variety in facilitating smokers completely switching or significantly reducing their

smoking." Appx.25. That is simply an application of the statute in a particular context based on the agency's accumulated experience.

B. Even if FDA's approach were viewed as a regulatory standard, FDA has authority to develop such standards through adjudication. As the Supreme Court explained in *Wages*, FDA has "discretion to work out the meaning of the TCA's comparative standard when evaluating premarket tobacco product applications." 604 U.S. at 582. "A contrary rule would be in tension with *Chenery II*'s teaching that, absent a statutory prohibition, agencies may generally develop regulatory standards through either adjudication or rulemaking." *Id.* The Supreme Court has thus recognized that "FDA was not required to issue [predecisional] guidance" to announce its approach. *Id.*

The TCA requires manufacturers to submit applications to market new tobacco products, 21 U.S.C. § 387j(b), and it directs FDA to adjudicate such applications, *id.* § 387j(c). And although the Act obligates the agency to issue interpretative rules and regulations in some other contexts, *see, e.g., id.* § 387e(j)(3) (specifying that FDA "shall issue regulations" with respect to "substantially equivalent" tobacco products); *id.* § 387k(*l*)(1) (specifying that FDA "shall issue regulations or guidance" with respect to

55

the review of "modified risk tobacco products"), in the premarket-adjudication context of § 387j(c), there is no such obligation for FDA to promulgate implementing regulations. The TCA thus allows FDA "to develop its premarket policy through a flexible, case-by-case adjudicative approach," without requiring "regulations." *Gripum, LLC v. FDA*, 47 F.4th 553, 559 (7th Cir. 2022).

The Supreme Court in *Wages* reiterated that "[u]nless Congress has specified otherwise, agencies are generally free to develop regulatory standards 'either by general [legislative] rule or by individual order' in an adjudication." 604 U.S. at 565 (second alteration in original) (quoting *SEC v. Chenery Corp.* (*Chenery II*), 332 U.S. 194, 202 (1947)). This is consistent with background principles of administrative law. The Supreme Court and this Court have long recognized that an agency may "announc[e] new principles in an adjudicative proceeding," even if those principles are in the form of a "general standard" that "would govern future conduct." *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292, 294 (1974); *see also American Airlines, Inc. v. Department of Transp.*, 202 F.3d 788, 797 (5th Cir. 2000) ("Agencies have discretion to choose between adjudication and rulemaking as a means of setting policy."). Indeed, the very "nature of adjudication is that

56

similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal." *Neustar, Inc. v. FCC*, 857 F.3d 886, 895 (D.C. Cir. 2017) (quotation marks omitted). That does not mean that an agency cannot devise and apply new standards in the course of an adjudication. *See Macy's Inc. v. NLRB*, 824 F.3d 557, 569-70 (5th Cir. 2016) (holding that the NLRB could "announce[] a new standard" in adjudication).

Petitioners' argument (Pet.Br.44, Suppl.Br.6) that FDA's approach is a "substantive rule" because it binds FDA staff is therefore misplaced. Standards announced in "adjudicative decision[s]" do not fit within the APA's "legislative/interpretive framework for rulemaking." *Miguel-Miguel v. Gonzales*, 500 F.3d 941, 950 (9th Cir. 2007) (emphasis omitted). Rather, agencies can use adjudication even "as a means of setting policy." *American Airlines*, 202 F.3d at 797.

Amici recognize (RJRV.Amicus.Br.15), as they must, that the APA permits FDA to establish standards through adjudication, but they argue (RJRV.Amicus.Br.16-20) that it was an abuse of discretion for FDA not to proceed through rulemaking here. Given the language of the TCA, which expressly contemplates adjudications for marketing denial orders, that

argument is unconvincing. *See* 21 U.S.C. § 387j. The "choice between rulemaking and adjudication lies in the first instance within the [agency]'s discretion." *Bell Aerospace*, 416 U.S. at 294. "Since *Bell Aerospace*," moreover, "'the [Supreme] Court has not even suggested that a court can constrain an agency's choice between rulemaking and adjudication.'" *Velasco-Giron v. Holder*, 773 F.3d 774, 779 (7th Cir. 2014) (alteration omitted). FDA's "judgment that adjudication best serves [the agency's] purpose is entitled to great weight," *Bell Aerospace*, 416 U.S. at 294, and nothing indicates that FDA abused its discretion when it proceeded by adjudication here.

Indeed, there is "ample indication" that "adjudication is especially appropriate in the instant context." *Bell Aerospace*, 416 U.S. at 294. The marketing-application process allows manufacturers to submit relevant evidence to FDA and gives FDA an opportunity to review that evidence and consider how to apply the TCA's standards in the concrete circumstances presented by applications to market particular products. For menthol-flavored e-cigarettes, for example, FDA took time to consider the evidence bearing on those products, *see* Appx.16-17, and the evidence presented in the premarket tobacco product applications helped shape

58

FDA's thinking.  Furthermore, proceeding by adjudication allows FDA more flexibility to assess new evidence that a manufacturer might include in a future application as well as changes in the market and scientific literature.  FDA did not abuse its discretion here in deciding that "an adjudicatory proceeding would produce the relevant information necessary to fair consideration" of the standard to be applied in deciding applications to market new tobacco products, and "that the notice and comment procedures required for formal rulemaking were impracticable and unnecessary."  *Mobil Expl. & Producing N. Am., Inc. v. FERC*, 881 F.2d 193, 199 (5th Cir. 1989).

Amici further contend (RJRV.Amicus.Br.17) that FDA abused its discretion because the agency allegedly changed position with regard to menthol-flavored e-cigarettes.  But as explained, the TCA expressly contemplates comparisons of different tobacco products, and FDA never represented that it would not look for reliable evidence of comparative efficacy in applications to market new menthol-flavored e-cigarettes.  *Supra* pp. 53-55.  Moreover, "[a]djudication can be used to announce new principles even if the principles involve a change from past policies."  *Mobil*, 881 F.2d at 198.  "[I]n order to constitute … an abuse [of discretion],

59

an adjudicative rule must be 'such a new departure [from prior policy] that [it] could not reasonably have been foreseen.'" *Tearney v. NTSB*, 868 F.2d 1451, 1453 (5th Cir. 1989) (fifth alteration in original). That is not the case here.

C. Nothing in the Tobacco Control Act displaces these well-settled principles of administrative law. Petitioners argue (Pet.Br.42-43) that FDA has promulgated a tobacco product standard—which requires notice and comment under the TCA, *see* 21 U.S.C. § 387g(c)—either by looking for evidence of comparative efficacy or by imposing what petitioners call a "de facto ban" on flavored e-cigarettes. That argument is meritless.

The TCA permits FDA to promulgate tobacco product standards, which are "uniform rules governing the composition of tobacco products or restricting their sale and distribution." *Fontem US, LLC v. FDA*, 82 F.4th 1207, 1218 (D.C. Cir. 2023); *see* 21 U.S.C. § 387g(a)(4). But FDA has not claimed to establish a tobacco product standard governing flavored e-cigarettes, nor did FDA deny NicQuid's applications on the ground that the products failed to "conform in all respects to a tobacco product standard." 21 U.S.C. § 387j(c)(2)(D). Rather, FDA weighed the relevant evidence as it pertained to NicQuid's applications and explained that

60

NicQuid failed to demonstrate that its products are appropriate for the protection of the public health, *id.* § 387j(c)(2)(A). *See supra* pp. 22-25, 53-55. FDA does not "impermissibly impose 'tobacco product standards'" when it undertakes an "adjudicatory review of [a product]'s risks and benefits" under 21 U.S.C. § 387j(c). *Bidi Vapor LLC v. FDA*, 134 F.4th 1282, 1287 (11th Cir. 2025).

Amici contend that FDA was required to undertake notice-and-comment rulemaking because FDA's approach could have been established as a tobacco product standard. RJRV.Amicus.Br.7. But nothing in the TCA contemplates that the agency had to go through the rulemaking process. While the Act gives FDA the authority to promulgate tobacco product standards through rulemaking, 21 U.S.C. § 387g, it does not require the agency to do so. *See Bidi Vapor*, 134 F.4th at 1287. As already explained, "the choice between rulemaking and adjudication" lies in FDA's discretion. *Bell Aerospace*, 416 U.S. at 294. Indeed, the tobacco product standard set forth in 21 U.S.C. § 387g(a)(1)(A) only underscores that FDA remains free to proceed through adjudication. That provision establishes a rule that a cigarette "shall not contain" certain characterizing flavors, but the provision expressly states that nothing in the provision "shall be construed

61

to limit [FDA]'s authority to take action" under other sections of the Act, 21 U.S.C. § 387g(a)(1)(A)—including its authority to deny premarket applications under § 387j because the manufacturer has failed to show that its flavored e-cigarette products are appropriate for the protection of the public health.

The fact that FDA's review of the scientific evidence has led it to the same conclusion in many cases, and that FDA has denied applications for other flavored e-cigarettes with similar evidentiary shortcomings to NicQuid's, simply reflects that the agency has been consistent in its approach. It does not make FDA's comparative risk assessment a tobacco product standard. *Contra* Suppl.Br.6; RJRV.Amicus.Br.6-10. As explained, adjudications often "contain[] reasoning that sweeps broadly," and the fact that an agency's reasoning might apply to "a 'large number'" of similar cases 'carries little weight' in deciding whether it is a rule or order." *ITServe All., Inc. v. U.S. Dep't of Homeland Sec.*, 71 F.4th 1028, 1035 (D.C. Cir. 2023); *see also American Airlines*, 202 F.3d at 797 (explaining that agencies have discretion to use adjudication "as a means of setting policy").

Petitioners fare no better in arguing that FDA has imposed a "de facto ban" on flavored e-cigarettes. Pet.Br.42. The individual review of

62

NicQuid's applications belies that claim.  That most applicants have failed to show that their flavored products meet the statutory standard does not mean that FDA has imposed an impermissible de facto ban on such products.  Regardless, FDA clearly has not imposed a de facto ban on flavored e-cigarettes because it has authorized several menthol-flavored e-cigarettes where the applicants established that their products provide a benefit greater than that provided by tobacco-flavored products.  *See* Tobacco Product Marketing Orders; NJOY Menthol E-Cigarette Press Release; JUUL Menthol E-Cigarette Press Release.  NicQuid simply failed to provide such evidence.

Petitioners also suggest (Pet.Br.43-44) that this Court already endorsed the allegation of a de facto ban, citing a footnote in *Wages & White Lion Investments, LLC v. FDA*, 90 F.4th 357, 384 n.5 (5th Cir. 2024) (en banc).  But the Supreme Court vacated this Court's decision in *Wages*.  604 U.S. at 592.  In addition, *Wages* involved only non-tobacco and non-menthol flavors, and the relevant footnote's suggestion that there was a "categorical ban" on flavored products is not applicable or accurate as to menthol-flavored products, some of which FDA has authorized.  In any event, the cited footnote was "peripheral" to the dispute and not "necessary to the

result," *United States v. Segura*, 747 F.3d 323, 328 (5th Cir. 2024) (quotation marks omitted), and the petitioners in *Wages* did not make a notice-and-comment argument in their opening brief before the en banc Court, so the issue did not receive "full and careful consideration," *id.* (quotation marks omitted). Neither that footnote nor this Court's earlier decision in *R.J. Reynolds*, 65 F.4th at 192-93, supports petitioners' counter-factual argument that FDA has imposed a de facto ban on menthol-flavored products. And neither of those earlier decisions addressed the distinct argument raised by petitioners here, that a "comparative-efficacy standard" cannot be applied without notice-and-comment rulemaking; rather, both cases turned on the "notice-and-comment" obligations that could attach if FDA had actually adopted a "de facto ban on flavored e-cigarettes." *Wages*, 90 F.4th at 384 n.5.[6]

D. Finally, petitioners assert that FDA bound itself through memoranda to apply a comparative-risk assessment for menthol products,

---

[6] *R.J. Reynolds* stated that a so-called "Fatal Flaw" memorandum constituted a substantive rule indicating "a de facto ban on non-tobacco-flavored e-cigarettes." 65 F.4th at 192-93 & 193 n.9. The Supreme Court's decision in *Wages* abrogated this understanding when it explained that the referenced memorandum was superseded and "played no role in [FDA's] review of applications," 604 U.S. at 577-78.

and that this was a regulatory action taken without proper procedures. Suppl.Br.7; *see also* RJRV.Amicus.Br.13-15. But the cited memoranda just memorialize an "analytical framework" that FDA developed in the process of adjudicating premarket tobacco product applications submitted by Logic Technology. *See* Appx.142-43; *see Logic Tech.*, 84 F.4th at 545-46. In the context of those applications, FDA determined that because "menthol-flavored [e-cigarettes] pose a substantial risk of youth use greater than tobacco-flavored [e-cigarettes] and similar to flavors such as candy, desserts, sweets, and mint," the agency would require the applicant to demonstrate that its menthol-flavored products were better, "relative to tobacco-flavored [e-cigarettes], in terms of promoting significant cigarette reduction or complete switching among adult smokers." Appx.149. The memoranda that petitioners rely upon simply memorialize FDA's internal deliberations.

The memoranda themselves belie amici's assertion (RJRV.Amicus.Br.16) that FDA's approach to menthol-flavored products was established "*before* [FDA] decided to 'adjudicate' applications." As explained, the memoranda reflect that FDA's approach was formulated in the course of FDA's "evaluation of the Logic menthol [applications]."

65

Appx.148.  Furthermore, nothing in the memoranda binds FDA to a

particular risk assessment, nor do they bind future applicants.  Indeed, it is

telling that FDA reviews the evidence and explains its conclusion in each

adjudication of an application to market a menthol-flavored product rather

than relying on the memoranda developed during the Logic adjudication.

But even if that were not the case, as just explained above, there is nothing

unusual or improper about an agency announcing new standards and

precedent in an adjudicative proceeding.

## IV.    NicQuid cannot petition for review in this Circuit.

If this Court were to find merit to any of petitioners' arguments, it

should grant relief only to petitioner Wood Creek Vapory and dismiss

NicQuid's petition.  The Tobacco Control Act provides that a person

adversely affected by a marketing denial order "may file a petition for

judicial review of such … denial with the United States Court of Appeals

for the District of Columbia or for the circuit in which such person resides

or has their principal place of business." 21 U.S.C. § 387l(a)(1).  NicQuid

has its principal place of business in the Sixth Circuit, not the Fifth Circuit.

And although Wood Creek Vapory has its principal place of business in the

Fifth Circuit, an out-of-circuit manufacturer may not sue based on the

residence of a retailer. The TCA's use of the term "such person" makes clear that a person may seek judicial review in a particular circuit (other than the D.C. Circuit) only if *that person* is based in the circuit. *See Amerada Petroleum Corp. v. Federal Power Comm'n*, 338 F.2d 808, 809-10 (10th Cir. 1964) (interpreting a similarly worded venue statute to mean that an out-of-circuit petitioner could not join a local petitioner); *National Fam. Farm Coal. v. U.S. EPA*, 966 F.3d 893, 930-32 (9th Cir. 2020) (Nelson, J., concurring) (same). Indeed, generally, in a multi-party case, venue must be proper for each party: "[E]ach plaintiff must be competent to sue" and "each defendant must be liable to be sued" in the chosen forum. *Smith v. Lyon*, 133 U.S. 315, 319 (1890) (quotation marks omitted); *see Camp v. Gress*, 250 U.S. 308 (1919).

Although the Supreme Court held in *FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226 (2025), that a retailer is adversely affected by a marketing denial order such that it can petition for review in the circuit of its residence, the Court did not address the government's position that "each petitioner in a joint petition for review must independently establish venue" under the Act, *see id.* at 240. Rather, the Court reserved that question for this Court to resolve in the first instance. *Id.* at 229-30.

67

NicQuid cannot sue in this circuit just because Wood Creek Vapory resides here, so this Court should dismiss NicQuid's petition. *See Trump v. CASA, Inc.*, 606 U.S. 831, 839-47, 851-54 (2025) (holding that equitable relief must be limited to that necessary to redress the plaintiff's injury).

## CONCLUSION

For the foregoing reasons, the petition for review should be denied.

Respectfully submitted,

*Of Counsel:*

MICHAEL B. STUART
*General Counsel*

*U.S. Department of Health and Human Services*

SEAN R. KEVENEY
*Chief Counsel*

WENDY S. VICENTE
*Deputy Chief Counsel, Litigation*

KWABENA AKOWUAH
*Associate Chief Counsel*
*Office of the Chief Counsel*

*U.S. Food and Drug Administration*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

JOSHUA M. KOPPEL
/s/ Kevin B. Soter
KEVIN B. SOTER
*Attorneys, Appellate Staff*
*Civil Division, Room 7222*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
kevin.b.soter@usdoj.gov
*(202) 305-1754*

January 2026

## CERTIFICATE OF SERVICE

I hereby certify that on January 26, 2026, I electronically filed the

foregoing brief with the Clerk of the Court for the United States Court of

Appeals for the Fifth Circuit by using the appellate CM/ECF system.


s/ Kevin B. Soter
Kevin B. Soter

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,872 words, according to the count of Microsoft Word.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared in 14-point Book Antiqua, a proportionally spaced typeface.

s/ Kevin B. Soter
Kevin B. Soter

ADDENDUM

# TABLE OF CONTENTS

Administrative Procedure Act (APA)

    5 U.S.C. § 706 ........................................................................................ A1

Tobacco Control Act (TCA)

    21 U.S.C. § 321 ..................................................................................... A2
    21 U.S.C. § 387a ................................................................................... A3
    21 U.S.C. § 387g ................................................................................... A5
    21 U.S.C. § 387j ................................................................................... A15
    21 U.S.C. § 387l ................................................................................... A24

**Administrative Procedure Act (APA)**

<mark>5 U.S.C. § 706</mark>

**§ 706. Scope of review**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--

    **(1)** compel agency action unlawfully withheld or unreasonably delayed; and

    **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be--

        **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        **(B)** contrary to constitutional right, power, privilege, or immunity;

        **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        **(D)** without observance of procedure required by law;

        **(E)** unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

        **(F)** unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

**Tobacco Control Act (TCA)**

21 U.S.C. § 321

**§ 321. Definitions; generally**

For the purposes of this chapter—

\*\*\*

**(rr)(1)** The term "tobacco product" means any product made or derived from tobacco, or containing nicotine from any source, that is intended for human consumption, including any component, part, or accessory of a tobacco product (except for raw materials other than tobacco used in manufacturing a component, part, or accessory of a tobacco product).

**(2)** The term "tobacco product" does not mean an article that is a drug under subsection (g)(1), a device under subsection (h), or a combination product described in section 353(g) of this title.

**(3)** The products described in paragraph (2) shall be subject to subchapter V of this chapter.

**(4)** A tobacco product shall not be marketed in combination with any other article or product regulated under this chapter (including a drug, biologic, food, cosmetic, medical device, or a dietary supplement).

**(5)** The term "tobacco product" does not mean an article that is a food under paragraph (f), if such article contains no nicotine, or no more than trace amounts of naturally occurring nicotine.

**21 U.S.C. § 387a**

**§ 387a. FDA authority over tobacco products**

**(a) In general**

Tobacco products, including modified risk tobacco products for which an order has been issued in accordance with section 387k of this title, shall be regulated by the Secretary under this subchapter and shall not be subject to the provisions of subchapter V.

**(b) Applicability**

This subchapter shall apply to all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco and to any other tobacco products that the Secretary by regulation deems to be subject to this subchapter. This subchapter shall also apply to any tobacco product containing nicotine that is not made or derived from tobacco.

**(c) Scope**

**(1) In general**

Nothing in this subchapter, or any policy issued or regulation promulgated thereunder, or in sections 101(a), 102, or 103 of title I, title II, or title III of the Family Smoking Prevention and Tobacco Control Act, shall be construed to affect, expand, or limit the Secretary's authority over (including the authority to determine whether products may be regulated), or the regulation of, products under this chapter that are not tobacco products under subchapter V or any other subchapter.

**(2) Limitation of authority**

**(A) In general**

The provisions of this subchapter shall not apply to tobacco leaf that is not in the possession of a manufacturer of tobacco products, or to the producers of tobacco leaf, including tobacco growers, tobacco warehouses, and tobacco grower cooperatives, nor shall any employee of the Food and Drug Administration have any authority to enter onto a farm owned by a producer of tobacco leaf without the written consent of such producer.

**(B) Exception**

Notwithstanding subparagraph (A), if a producer of tobacco leaf is also a tobacco product manufacturer or controlled by a tobacco product manufacturer, the producer shall be subject to this subchapter in the producer's capacity as a manufacturer. The exception in this subparagraph shall not apply to a producer of tobacco leaf who grows tobacco under a contract with a tobacco product manufacturer and who is not otherwise engaged in the manufacturing process.

**(C) Rule of construction**

Nothing in this subchapter shall be construed to grant the Secretary authority to promulgate regulations on any matter that involves the production of tobacco leaf or a producer thereof, other than activities by a manufacturer affecting production.

**(d) Rulemaking procedures**

Each rulemaking under this subchapter shall be in accordance with chapter 5 of Title 5. This subsection shall not be construed to affect the rulemaking provisions of section 102(a) of the Family Smoking Prevention and Tobacco Control Act.

**(e) Center for Tobacco Products**

Not later than 90 days after June 22, 2009, the Secretary shall establish within the Food and Drug Administration the Center for Tobacco Products, which shall report to the Commissioner of Food and Drugs in the same manner as the other agency centers within the Food and Drug Administration. The Center shall be responsible for the implementation of this subchapter and related matters assigned by the Commissioner.

**(f) Office to assist small tobacco product manufacturers**

The Secretary shall establish within the Food and Drug Administration an identifiable office to provide technical and other nonfinancial assistance to small tobacco product manufacturers to assist them in complying with the requirements of this chapter.

**(g) Consultation prior to rulemaking**

Prior to promulgating rules under this subchapter, the Secretary shall endeavor to consult with other Federal agencies as appropriate.

**21 U.S.C. § 387g**

**§ 387g. Tobacco product standards**

### (a) In general

#### (1) Special rules

##### (A) Special rule for cigarettes

Beginning 3 months after June 22, 2009, a cigarette or any of its component parts (including the tobacco, filter, or paper) shall not contain, as a constituent (including a smoke constituent) or additive, an artificial or natural flavor (other than tobacco or menthol) or an herb or spice, including strawberry, grape, orange, clove, cinnamon, pineapple, vanilla, coconut, licorice, cocoa, chocolate, cherry, or coffee, that is a characterizing flavor of the tobacco product or tobacco smoke. Nothing in this subparagraph shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol or any artificial or natural flavor, herb, or spice not specified in this subparagraph.

##### (B) Additional special rule

Beginning 2 years after June 22, 2009, a tobacco product manufacturer shall not use tobacco, including foreign grown tobacco, that contains a pesticide chemical residue that is at a level greater than is specified by any tolerance applicable under Federal law to domestically grown tobacco.

#### (2) Revision of tobacco product standards

The Secretary may revise the tobacco product standards in paragraph (1) in accordance with subsection (c).

#### (3) Tobacco product standards

##### (A) In general

The Secretary may adopt tobacco product standards in addition to those in paragraph (1) if the Secretary finds that a tobacco product standard is appropriate for the protection of the public health.

**(B) Determinations**

**(i) Considerations**

In making a finding described in subparagraph (A), the Secretary shall consider scientific evidence concerning--

**(I)** the risks and benefits to the population as a whole, including users and nonusers of tobacco products, of the proposed standard;

**(II)** the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

**(III)** the increased or decreased likelihood that those who do not use tobacco products will start using such products.

**(ii) Additional considerations**

In the event that the Secretary makes a determination, set forth in a proposed tobacco product standard in a proposed rule, that it is appropriate for the protection of public health to require the reduction or elimination of an additive, constituent (including a smoke constituent), or other component of a tobacco product because the Secretary has found that the additive, constituent, or other component is or may be harmful, any party objecting to the proposed standard on the ground that the proposed standard will not reduce or eliminate the risk of illness or injury may provide for the Secretary's consideration scientific evidence that demonstrates that the proposed standard will not reduce or eliminate the risk of illness or injury.

**(4) Content of tobacco product standards**

A tobacco product standard established under this section for a tobacco product--

**(A)** shall include provisions that are appropriate for the protection of the public health, including provisions, where appropriate--

A6

(i) for nicotine yields of the product;

(ii) for the reduction or elimination of other constituents, including smoke constituents, or harmful components of the product; or

(iii) relating to any other requirement under subparagraph (B);

(B) shall, where appropriate for the protection of the public health, include--

(i) provisions respecting the construction, components, ingredients, additives, constituents, including smoke constituents, and properties of the tobacco product;

(ii) provisions for the testing (on a sample basis or, if necessary, on an individual basis) of the tobacco product;

(iii) provisions for the measurement of the tobacco product characteristics of the tobacco product;

(iv) provisions requiring that the results of each or of certain of the tests of the tobacco product required to be made under clause (ii) show that the tobacco product is in conformity with the portions of the standard for which the test or tests were required; and

(v) a provision requiring that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title;

(C) shall, where appropriate, require the use and prescribe the form and content of labeling for the proper use of the tobacco product; and

(D) shall require tobacco products containing foreign-grown tobacco to meet the same standards applicable to tobacco products containing domestically grown tobacco.

A7

**(5) Periodic reevaluation of tobacco product standards**

The Secretary shall provide for periodic evaluation of tobacco product standards established under this section to determine whether such standards should be changed to reflect new medical, scientific, or other technological data. The Secretary may provide for testing under paragraph (4)(B) by any person.

**(6) Involvement of other agencies; informed persons**

In carrying out duties under this section, the Secretary shall endeavor to--

> **(A)** use personnel, facilities, and other technical support available in other Federal agencies;
>
> **(B)** consult with other Federal agencies concerned with standard setting and other nationally or internationally recognized standard-setting entities; and
>
> **(C)** invite appropriate participation, through joint or other conferences, workshops, or other means, by informed persons representative of scientific, professional, industry, agricultural, or consumer organizations who in the Secretary's judgment can make a significant contribution.

**(b) Considerations by Secretary**

**(1) Technical achievability**

The Secretary shall consider information submitted in connection with a proposed standard regarding the technical achievability of compliance with such standard, including with regard to any differences related to the technical achievability of compliance with such standard for products in the same class containing nicotine not made or derived from tobacco and products containing nicotine made or derived from tobacco.

**(2) Other considerations**

The Secretary shall consider all other information submitted in connection with a proposed standard, including information concerning the countervailing effects of the tobacco product

A8

standard on the health of adolescent tobacco users, adult tobacco users, or nontobacco users, such as the creation of a significant demand for contraband or other tobacco products that do not meet the requirements of this subchapter and the significance of such demand.

**(c) Proposed standards**

**(1) In general**

The Secretary shall publish in the Federal Register a notice of proposed rulemaking for the establishment, amendment, or revocation of any tobacco product standard.

**(2) Requirements of notice**

A notice of proposed rulemaking for the establishment or amendment of a tobacco product standard for a tobacco product shall--

**(A)** set forth a finding with supporting justification that the tobacco product standard is appropriate for the protection of the public health;

**(B)** invite interested persons to submit a draft or proposed tobacco product standard for consideration by the Secretary;

**(C)** invite interested persons to submit comments on structuring the standard so that it does not advantage foreign-grown tobacco over domestically grown tobacco; and

**(D)** invite the Secretary of Agriculture to provide any information or analysis which the Secretary of Agriculture believes is relevant to the proposed tobacco product standard.

**(3) Finding**

A notice of proposed rulemaking for the revocation of a tobacco product standard shall set forth a finding with supporting justification that the tobacco product standard is no longer appropriate for the protection of the public health.

**(4) Comment**

The Secretary shall provide for a comment period of not less than 60 days.

**(d) Promulgation**

**(1) In general**

After the expiration of the period for comment on a notice of proposed rulemaking published under subsection (c) respecting a tobacco product standard and after consideration of comments submitted under subsections (b) and (c) and any report from the Tobacco Products Scientific Advisory Committee, the Secretary shall--

**(A)** if the Secretary determines that the standard would be appropriate for the protection of the public health, promulgate a regulation establishing a tobacco product standard and publish in the Federal Register findings on the matters referred to in subsection (c); or

**(B)** publish a notice terminating the proceeding for the development of the standard together with the reasons for such termination.

**(2) Effective date**

A regulation establishing a tobacco product standard shall set forth the date or dates upon which the standard shall take effect, but no such regulation may take effect before 1 year after the date of its publication unless the Secretary determines that an earlier effective date is necessary for the protection of the public health. Such date or dates shall be established so as to minimize, consistent with the public health, economic loss to, and disruption or dislocation of, domestic and international trade. In establishing such effective date or dates, the Secretary shall consider information submitted in connection with a proposed product standard by interested parties, including manufacturers and tobacco growers, regarding the technical achievability of compliance with the standard, and including information concerning the existence of patents that make it impossible to comply in the timeframe envisioned in the proposed

A10

standard. If the Secretary determines, based on the Secretary's evaluation of submitted comments, that a product standard can be met only by manufacturers requiring substantial changes to the methods of farming the domestically grown tobacco used by the manufacturer, the effective date of that product standard shall be not less than 2 years after the date of publication of the final regulation establishing the standard.

**(3) Limitation on power granted to the Food and Drug Administration**

Because of the importance of a decision of the Secretary to issue a regulation

> **(A)** banning all cigarettes, all smokeless tobacco products, all little cigars, all cigars other than little cigars, all pipe tobacco, or all roll-your-own tobacco products; or

> **(B)** requiring the reduction of nicotine yields of a tobacco product to zero,

the Secretary is prohibited from taking such actions under this chapter.

**(4) Amendment; revocation**

**(A) Authority**

The Secretary, upon the Secretary's own initiative or upon petition of an interested person, may by a regulation, promulgated in accordance with the requirements of subsection (c) and paragraph (2), amend or revoke a tobacco product standard.

**(B) Effective date**

The Secretary may declare a proposed amendment of a tobacco product standard to be effective on and after its publication in the Federal Register and until the effective date of any final action taken on such amendment if the Secretary determines that making it so effective is in the public interest.

**(5) Referral to Advisory Committee**

**(A) In general**

The Secretary may refer a proposed regulation for the establishment, amendment, or revocation of a tobacco product standard to the Tobacco Products Scientific Advisory Committee for a report and recommendation with respect to any matter involved in the proposed regulation which requires the exercise of scientific judgment.

**(B) Initiation of referral**

The Secretary may make a referral under this paragraph--

(i) on the Secretary's own initiative; or

(ii) upon the request of an interested person that--

(I) demonstrates good cause for the referral; and

(II) is made before the expiration of the period for submission of comments on the proposed regulation.

**(C) Provision of data**

If a proposed regulation is referred under this paragraph to the Tobacco Products Scientific Advisory Committee, the Secretary shall provide the Advisory Committee with the data and information on which such proposed regulation is based.

**(D) Report and recommendation**

The Tobacco Products Scientific Advisory Committee shall, within 60 days after the referral of a proposed regulation under this paragraph and after independent study of the data and information furnished to it by the Secretary and other data and information before it, submit to the Secretary a report and recommendation respecting such regulation, together with all underlying data and information and a statement of the reason or basis for the recommendation.

A12

### (E) Public availability

The Secretary shall make a copy of each report and recommendation under subparagraph (D) publicly available.

## (e) Menthol cigarettes

### (1) Referral; considerations

Immediately upon the establishment of the Tobacco Products Scientific Advisory Committee under section 387q(a) of this title, the Secretary shall refer to the Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the impact of the use of menthol in cigarettes on the public health, including such use among children, African-Americans, Hispanics, and other racial and ethnic minorities. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsections (a)(3)(B)(i) and (b).

### (2) Report and recommendation

Not later than 1 year after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

### (3) Rule of construction

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter applicable to menthol.

## (f) Dissolvable tobacco products

### (1) Referral; considerations

The Secretary shall refer to the Tobacco Products Scientific Advisory Committee for report and recommendation, under section 387q(c)(4) of this title, the issue of the nature and impact of the use of dissolvable tobacco products on the public health, including such use among children. In its review, the Tobacco Products Scientific Advisory Committee shall address the considerations listed in subsection (a)(3)(B)(i).

A13

**(2) Report and recommendation**

Not later than 2 years after its establishment, the Tobacco Product Scientific Advisory Committee shall submit to the Secretary the report and recommendations required pursuant to paragraph (1).

**(3) Rule of construction**

Nothing in this subsection shall be construed to limit the Secretary's authority to take action under this section or other sections of this chapter at any time applicable to any dissolvable tobacco product.

**§ 387j. Application for review of certain tobacco products**

### (a) In general

#### (1) New tobacco product defined

For purposes of this section the term "new tobacco product" means

> **(A)** any tobacco product (including those products in test markets) that was not commercially marketed in the United States as of February 15, 2007; or

> **(B)** any modification (including a change in design, any component, any part, or any constituent, including a smoke constituent, or in the content, delivery or form of nicotine, or any other additive or ingredient) of a tobacco product where the modified product was commercially marketed in the United States after February 15, 2007.

#### (2) Premarket review required

##### (A) New products

An order under subsection (c)(1)(A)(i) for a new tobacco product is required unless--

> **(i)** the manufacturer has submitted a report under section 387e(j) of this title; and the Secretary has issued an order that the tobacco product--

> > **(I)** is substantially equivalent to a tobacco product commercially marketed (other than for test marketing) in the United States as of February 15, 2007; and

> > **(II)** is in compliance with the requirements of this chapter; or

> **(ii)** the tobacco product is exempt from the requirements of section 387e(j) of this title pursuant to a regulation issued under section 387e(j)(3) of this title.

##### (B) Application to certain post-February 15, 2007, products

Subparagraph (A) shall not apply to a tobacco product--

A15

**(i)** that was first introduced or delivered for introduction into interstate commerce for commercial distribution in the United States after February 15, 2007, and prior to the date that is 21 months after June 22, 2009; and

**(ii)** for which a report was submitted under section 387e(j) of this title within such 21-month period,

except that subparagraph (A) shall apply to the tobacco product if the Secretary issues an order that the tobacco product is not substantially equivalent.

**(3) Substantially equivalent defined**

**(A) In general**

In this section and section 387e(j) of this title, the term "substantially equivalent" or "substantial equivalence" means, with respect to the tobacco product being compared to the predicate tobacco product, that the Secretary by order has found that the tobacco product--

**(i)** has the same characteristics as the predicate tobacco product; or

**(ii)** has different characteristics and the information submitted contains information, including clinical data if deemed necessary by the Secretary, that demonstrates that it is not appropriate to regulate the product under this section because the product does not raise different questions of public health.

**(B) Characteristics**

In subparagraph (A), the term "characteristics" means the materials, ingredients, design, composition, heating source, or other features of a tobacco product.

**(C) Limitation**

A tobacco product may not be found to be substantially equivalent to a predicate tobacco product that has been removed

from the market at the initiative of the Secretary or that has been determined by a judicial order to be misbranded or adulterated.

**(4) Health information**

**(A) Summary**

As part of a submission under section 387e(j) of this title respecting a tobacco product, the person required to file a premarket notification under such section shall provide an adequate summary of any health information related to the tobacco product or state that such information will be made available upon request by any person.

**(B) Required information**

Any summary under subparagraph (A) respecting a tobacco product shall contain detailed information regarding data concerning adverse health effects and shall be made available to the public by the Secretary within 30 days of the issuance of a determination that such tobacco product is substantially equivalent to another tobacco product.

**(b) Application**

**(1) Contents**

An application under this section shall contain--

**(A)** full reports of all information, published or known to, or which should reasonably be known to, the applicant, concerning investigations which have been made to show the health risks of such tobacco product and whether such tobacco product presents less risk than other tobacco products;

**(B)** a full statement of the components, ingredients, additives, and properties, and of the principle or principles of operation, of such tobacco product;

**(C)** a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such tobacco product;

A17

**(D)** an identifying reference to any tobacco product standard under section 387g of this title which would be applicable to any aspect of such tobacco product, and either adequate information to show that such aspect of such tobacco product fully meets such tobacco product standard or adequate information to justify any deviation from such standard;

**(E)** such samples of such tobacco product and of components thereof as the Secretary may reasonably require;

**(F)** specimens of the labeling proposed to be used for such tobacco product; and

**(G)** such other information relevant to the subject matter of the application as the Secretary may require.

**(2) Referral to Tobacco Products Scientific Advisory Committee**

Upon receipt of an application meeting the requirements set forth in paragraph (1), the Secretary--

**(A)** may, on the Secretary's own initiative; or

**(B)** may, upon the request of an applicant,

refer such application to the Tobacco Products Scientific Advisory Committee for reference and for submission (within such period as the Secretary may establish) of a report and recommendation respecting the application, together with all underlying data and the reasons or basis for the recommendation.

**(c) Action on application**

**(1) Deadline**

**(A) In general**

As promptly as possible, but in no event later than 180 days after the receipt of an application under subsection (b), the Secretary, after considering the report and recommendation submitted under subsection (b)(2), shall--

**(i)** issue an order that the new product may be introduced or delivered for introduction into interstate commerce if the

Secretary finds that none of the grounds specified in paragraph (2) of this subsection applies; or

**(ii)** issue an order that the new product may not be introduced or delivered for introduction into interstate commerce if the Secretary finds (and sets forth the basis for such finding as part of or accompanying such denial) that 1 or more grounds for denial specified in paragraph (2) of this subsection apply.

**(B) Restrictions on sale and distribution**

An order under subparagraph (A)(i) may require that the sale and distribution of the tobacco product be restricted but only to the extent that the sale and distribution of a tobacco product may be restricted under a regulation under section 387f(d) of this title.

**(2) Denial of application**

The Secretary shall deny an application submitted under subsection (b) if, upon the basis of the information submitted to the Secretary as part of the application and any other information before the Secretary with respect to such tobacco product, the Secretary finds that--

**(A)** there is a lack of a showing that permitting such tobacco product to be marketed would be appropriate for the protection of the public health;

**(B)** the methods used in, or the facilities or controls used for, the manufacture, processing, or packing of such tobacco product do not conform to the requirements of section 387f(e) of this title;

**(C)** based on a fair evaluation of all material facts, the proposed labeling is false or misleading in any particular; or

**(D)** such tobacco product is not shown to conform in all respects to a tobacco product standard in effect under section 387g of this title, and there is a lack of adequate information to justify the deviation from such standard.

A19

## (3) Denial information

Any denial of an application shall, insofar as the Secretary determines to be practicable, be accompanied by a statement informing the applicant of the measures required to remove such application from deniable form (which measures may include further research by the applicant in accordance with 1 or more protocols prescribed by the Secretary).

## (4) Basis for finding

For purposes of this section, the finding as to whether the marketing of a tobacco product for which an application has been submitted is appropriate for the protection of the public health shall be determined with respect to the risks and benefits to the population as a whole, including users and nonusers of the tobacco product, and taking into account--

**(A)** the increased or decreased likelihood that existing users of tobacco products will stop using such products; and

**(B)** the increased or decreased likelihood that those who do not use tobacco products will start using such products.

## (5) Basis for action

### (A) Investigations

For purposes of paragraph (2)(A), whether permitting a tobacco product to be marketed would be appropriate for the protection of the public health shall, when appropriate, be determined on the basis of well-controlled investigations, which may include 1 or more clinical investigations by experts qualified by training and experience to evaluate the tobacco product.

### (B) Other evidence

If the Secretary determines that there exists valid scientific evidence (other than evidence derived from investigations described in subparagraph (A)) which is sufficient to evaluate the tobacco product, the Secretary may authorize that the determination for purposes of paragraph (2)(A) be made on the basis of such evidence.

A20

**(d) Withdrawal and temporary suspension**

**(1) In general**

The Secretary shall, upon obtaining, where appropriate, advice on scientific matters from the Tobacco Products Scientific Advisory Committee, and after due notice and opportunity for informal hearing for a tobacco product for which an order was issued under subsection (c)(1)(A)(i), issue an order withdrawing the order if the Secretary finds--

**(A)** that the continued marketing of such tobacco product no longer is appropriate for the protection of the public health;

**(B)** that the application contained or was accompanied by an untrue statement of a material fact;

**(C)** that the applicant--

**(i)** has failed to establish a system for maintaining records, or has repeatedly or deliberately failed to maintain records or to make reports, required by an applicable regulation under section 387i of this title;

**(ii)** has refused to permit access to, or copying or verification of, such records as required by section 374 of this title; or

**(iii)** has not complied with the requirements of section 387e of this title;

**(D)** on the basis of new information before the Secretary with respect to such tobacco product, evaluated together with the evidence before the Secretary when the application was reviewed, that the methods used in, or the facilities and controls used for, the manufacture, processing, packing, or installation of such tobacco product do not conform with the requirements of section 387f(e) of this title and were not brought into conformity with such requirements within a reasonable time after receipt of written notice from the Secretary of nonconformity;

**(E)** on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when the application was reviewed, that the labeling of such tobacco

A21

product, based on a fair evaluation of all material facts, is false or misleading in any particular and was not corrected within a reasonable time after receipt of written notice from the Secretary of such fact; or

**(F)** on the basis of new information before the Secretary, evaluated together with the evidence before the Secretary when such order was issued, that such tobacco product is not shown to conform in all respects to a tobacco product standard which is in effect under section 387g of this title, compliance with which was a condition to the issuance of an order relating to the application, and that there is a lack of adequate information to justify the deviation from such standard.

## (2) Appeal

The holder of an application subject to an order issued under paragraph (1) withdrawing an order issued pursuant to subsection (c)(1)(A)(i) may, by petition filed on or before the 30th day after the date upon which such holder receives notice of such withdrawal, obtain review thereof in accordance with section 387l of this title.

## (3) Temporary suspension

If, after providing an opportunity for an informal hearing, the Secretary determines there is reasonable probability that the continuation of distribution of a tobacco product under an order would cause serious, adverse health consequences or death, that is greater than ordinarily caused by tobacco products on the market, the Secretary shall by order temporarily suspend the authority of the manufacturer to market the product. If the Secretary issues such an order, the Secretary shall proceed expeditiously under paragraph (1) to withdraw such application.

## (e) Service of order

An order issued by the Secretary under this section shall be served--

**(1)** in person by any officer or employee of the department designated by the Secretary; or

**(2)** by mailing the order by registered mail or certified mail addressed to the applicant at the applicant's last known address in the records of the Secretary.

## (f) Records

### (1) Additional information

In the case of any tobacco product for which an order issued pursuant to subsection (c)(1)(A)(i) for an application filed under subsection (b) is in effect, the applicant shall establish and maintain such records, and make such reports to the Secretary, as the Secretary may by regulation, or by order with respect to such application, prescribe on the basis of a finding that such records and reports are necessary in order to enable the Secretary to determine, or facilitate a determination of, whether there is or may be grounds for withdrawing or temporarily suspending such order.

### (2) Access to records

Each person required under this section to maintain records, and each person in charge of custody thereof, shall, upon request of an officer or employee designated by the Secretary, permit such officer or employee at all reasonable times to have access to and copy and verify such records.

## (g) Investigational tobacco product exemption for investigational use

The Secretary may exempt tobacco products intended for investigational use from the provisions of this subchapter under such conditions as the Secretary may by regulation prescribe.

A23

**21 U.S.C. § 387*l***

**§ 387*l*. Judicial review**

**(a) Right to review**

**(1) In general**

Not later than 30 days after--

**(A)** the promulgation of a regulation under section 387g of this title establishing, amending, or revoking a tobacco product standard; or

**(B)** a denial of an application under section 387j(c) of this title,

any person adversely affected by such regulation or denial may file a petition for judicial review of such regulation or denial with the United States Court of Appeals for the District of Columbia or for the circuit in which such person resides or has their principal place of business.

**(2) Requirements**

**(A) Copy of petition**

A copy of the petition filed under paragraph (1) shall be transmitted by the clerk of the court involved to the Secretary.

**(B) Record of proceedings**

On receipt of a petition under subparagraph (A), the Secretary shall file in the court in which such petition was filed--

**(i)** the record of the proceedings on which the regulation or order was based; and

**(ii)** a statement of the reasons for the issuance of such a regulation or order.

**(C) Definition of record**

In this section, the term "record" means--

**(i)** all notices and other matter published in the Federal Register with respect to the regulation or order reviewed;

**(ii)** all information submitted to the Secretary with respect to such regulation or order;

A24

**(iii)** proceedings of any panel or advisory committee with respect to such regulation or order;

**(iv)** any hearing held with respect to such regulation or order; and

**(v)** any other information identified by the Secretary, in the administrative proceeding held with respect to such regulation or order, as being relevant to such regulation or order.

**(b) Standard of review**

Upon the filing of the petition under subsection (a) for judicial review of a regulation or order, the court shall have jurisdiction to review the regulation or order in accordance with chapter 7 of Title 5 and to grant appropriate relief, including interim relief, as provided for in such chapter. A regulation or denial described in subsection (a) shall be reviewed in accordance with section 706(2)(A) of Title 5.

**(c) Finality of judgment**

The judgment of the court affirming or setting aside, in whole or in part, any regulation or order shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification, as provided in section 1254 of Title 28.

**(d) Other remedies**

The remedies provided for in this section shall be in addition to, and not in lieu of, any other remedies provided by law.

**(e) Regulations and orders must recite basis in record**

To facilitate judicial review, a regulation or order issued under section 387f, 387g, 387h, 387i, 387j, or 387p of this title shall contain a statement of the reasons for the issuance of such regulation or order in the record of the proceedings held in connection with its issuance.

A25